Reversed and remanded for re-entry of the judgment in favor of defendant.

992 A.2d 20

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. N.S. AND R.B., DEFENDANTS–APPELLANTS.

IN THE MATTER OF K.A.N., J.B. AND K.B., MINORS.

Superior Court of New Jersey
Appellate Division

Argued February 9, 2010—Decided April 14, 2010.

594

596

598

600

Before Judges PARRILLO, LIHOTZ and ASHRAFI.

*Mary Potter,* Designated Counsel, argued the cause for appellant N.S. (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Potter,* of counsel and on the brief).

*G. Christopher Kilbride* argued the cause for appellant R.B. (*Kilbride & Frank,* attorneys; *Mr. Kilbride,* on the brief).

*Mira Ogrizovic,* Deputy Attorney General argued the cause for respondent DYFS (*Paula T. Dow,* Acting Attorney General, attor-

ney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Ms. Ogrizovic,* on the brief).

*Carol A. Weil,* Designated Counsel, argued the cause for respondent J.N. (*Yvonne Smith Segars,* Public Defender, attorney).

*Joyce Maraziti,* Designated Counsel, argued the cause for minors (*Yvonne Smith Segars,* Public Defender, Law Guardian, attorney; *Ms. Maraziti,* on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

In these consolidated Title Nine matters, *N.J.S.A.* 9:6–1 to – 8.73, N.S. and R.B. separately appeal from a finding following a factfinding hearing that they committed acts of abuse and neglect with regard to the minor child K.S.N., who died while in their care. Defendants ask this court to consider (1) whether N.S. and R.B. may challenge the court's finding of abuse and neglect, even though they have not appealed from the final dispositional order terminating the litigation; (2) whether the evidence presented was sufficient to support the court's findings; (3) whether N.S.'s right to counsel of her choice was violated by the denial of her request to substitute criminal counsel as her attorney in the Title Nine proceeding; and (4) whether R.B.'s trial counsel was ineffective. Following our consideration of the arguments raised, in light of the record and applicable legal standards, we affirm.

I.

N.S. is the mother of four children: K.S.N., who is deceased, K.A.N., J.B. and the youngest, K.B. J.N. is the father of K.S.N. and K.A.N. R.B. is the father of J.B. and K.B. At the time of K.S.N.'s death, the older three children were living with N.S. and R.B. Although J.N. had joint legal custody of his children, he did not have much contact with them. K.B. was born on September 27, 2005, after K.S.N.'s death.

 The Division of Youth & Family Services (DYFS or Division) first received a referral regarding K.S.N. on November 25, 2002, when a Head Start Daycare staff member reported the child's complaints of pain from a scratch on his penis. K.S.N. told the daycare worker R.B. had squeezed his penis with his fingernails the prior evening because he would not follow directions or go to sleep. DYFS worker Eileen Wolff interviewed K.S.N. He said he did not like it when his mother went out and left him alone with R.B., who was "the boss," because R.B. hit him with a paddle. A physical examination revealed no marks on the child. Wolff also interviewed R.B., who denied striking the child but admitted he had been wrestling with K.S.N. a few months past, when he accidentally pinched the child's penis. The referral was deemed "unsubstantiated" due to a lack of physical evidence and the divergent statements from K.S.N. and R.B.[1]

DYFS received a second referral on May 20, 2003. While J.N. was visiting him at school, K.S.N. told his father R.B. had squeezed his penis, and put a sock in his mouth, and taped it shut. After interviews were conducted, a different caseworker concluded the child was not afraid of R.B., who interacted appropriately with him during the interview. This allegation was also deemed unsubstantiated. However, N.S. and R.B. consented to a Division Case Plan in which R.B. agreed not to roughhouse with the children.

On March 29, 2004, DYFS was notified that five-year-old K.S.N. had died at approximately 3:00 p.m. DYFS worker Sarah Jan-

---

[1] A "substantiated" finding is one where "the available information, as evaluated by the child protective services investigator, indicates by a preponderance of the evidence that a child is an abused or neglected child as defined in *N.J.A.C.* 10:133–1.3 because the alleged child victim has been harmed or placed at risk of harm by a parent or guardian." *N.J.A.C.* 10:129–1.3. An unsubstantiated finding, therefore, is one where the evidence is insufficient to make such an evaluation. This differs from an "unfounded" finding, which is made when "[t]here is not a preponderance of evidence that the alleged child victim was harmed or placed at substantial risk of harm;" or "[t]here is not a preponderance of evidence indicating that a parent or guardian and child were involved." *Ibid.*

kowski interviewed N.S. and R.B., learning that on Sunday, March 28, R.B. had been caring for K.S.N., K.A.N., and J.B. while N.S. worked as a nurse's aide from 7 a.m. until 11 p.m. R.B. told Jankowski he went into the boys' bedroom shortly after lunch and caught K.S.N. and K.A.N. "wrestling" and saw K.A.N. "bouncing on [K.S.N.]'s stomach." Around 3:00 p.m., K.S.N. complained of stomach pain and began vomiting. That day, K.S.N. threw-up approximately five times. N.S. returned home around 11:20 p.m. During the night, K.S.N. vomited twice more.

The next morning, N.S. checked on K.S.N., who said he did not want to go to school. This was unusual, as the child "loved school." N.S. left to take K.A.N. to school and get to work by 7 a.m., while R.B. gave K.S.N. the first of three doses of anti-nausea medication and ginger ale. R.B. noted K.S.N. was weak. He called the child's pediatrician, who recommended giving the child flat soda and to call back if he noticed no improvement in the child's condition. R.B. called N.S. at work and stated K.S.N. exhibited shallow breathing and continued vomiting. N.S. arranged for a 2:15 p.m. doctor's appointment and returned home at 2:00 p.m. By that time, K.S.N.'s stomach was distended, and the child was limp and non-responsive. R.B. told Jankowski the child's "whole demeanor changed," as he went from "a little weak to real weak." R.B. explained K.S.N. was drooling and "kinda spaced out." N.S. stated she held a glass of water for K.S.N., who was too weak to drink on his own, and noticed his hands were cold and clammy. As N.S. drove the child to the doctor, she saw him slump over, close his eyes and vomit through his nose.

At the doctor's office, K.S.N. had no pulse and CPR was initiated. The child was taken to the hospital emergency room, where doctors unsuccessfully attempted to restart his heart. The preliminary autopsy revealed K.S.N. suffered blunt force abdominal trauma causing lacerations of his intestine, with resultant severe peritonitis.

Jankowski spoke with the pediatrician, who stated R.B. had called regarding K.S.N.'s vomiting and was told to give him clear

liquids and call back if the vomiting persisted. At 11:45 a.m., N.S. called to schedule an appointment. She was given a 2 p.m. appointment and told the boy could be seen earlier if he remained sick. When K.S.N. arrived a little after 2 p.m., his pupils were dilated and fixed; he was pale and not breathing and had no detectable heart rate or pulse.

In the presence of N.S., Jankowski asked K.A.N., who was then three-and-a-half years old, if he and K.S.N. had wrestled. He said, "No." When his mother told him to tell the truth, he looked at her and did not respond. N.S. stated K.A.N. had been disciplined for wrestling. K.A.N. began to cry and family members arrived at the residence; so Jankowski ended the interview.

Jankowski testified that, while taking the children to their foster placement, K.A.N. told her his parents hit him with belts and that, after K.S.N. had jumped on him causing his nose to bleed, K.S.N. was punched in the stomach, presumably by R.B., and placed in the corner.

Jankowski attended an interview conducted the following day by Natalie Zuppa of the Monmouth County Prosecutor's Office. In the presence of his mother, K.A.N. gave several nonsensical responses to questions but also stated "daddy" had "punched" K.S.N. in the stomach because he was "I[ ]ying down and not listening."

On March 30, 2004, DYFS exercised a *Dodd*[2] removal of K.A.N. and J.B., placing the children in foster care. *N.J.S.A.* 9:6–8.29. The following day, the Division filed an order to show cause and verified complaint seeking custody, care, and supervision of K.A.N. and J.B. *N.J.S.A.* 30:4C–12; *see also Division of Youth & Family Servs. v. E.B.*, 137 *N.J.* 180, 185, 644 *A.2d* 1093 (1994). J.N. was joined as a party defendant solely for dispositional

---

[2] A *"Dodd* removal" refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at *N.J.S.A.* 9:6–8.21 to –8.82. The Act was authored by former Senate President Frank J. "Pat" Dodd in 1974.

purposes. The court granted the Division's request pending further review.

When the matter was heard on April 14, 2004, the return date of the order to show cause, J.N. filed a complaint for custody of K.A.N. Services were ordered for all three parents, including weekly supervised visitation, as well as psychological and substance abuse examinations. On May 20, 2004, the two children were placed with their maternal grandmother and her husband. N.S. and R.B. were restrained from the grandmother's home and permitted visitation only as supervised by the Division. On July 7, 2004, the court continued a child placement review board order terminating R.B.'s visitation with K.A.N.

A four-day factfinding hearing began on October 13, 2004. In addition to caseworkers Jankowski and Wolff, who related the Division's efforts after the three referrals, Neptune Township Police Officer John Jackson and Detective Michael Emmons testified regarding their investigation following K.S.N.'s death. The reports of Chester Sigafoos, Ph.D., who performed psychological examinations of N.S. and R.B., were also introduced.

The Division presented the expert testimony of Elizabeth Susan Hodgson, M.D., a pediatrician with the Dorothy B. Hirsch Regional Child Protection Center and co-chair of the Central Region Child Fatality Review Board, which reviews the deaths of all New Jersey children under age eighteen. Dr. Hodgson reviewed K.S.N.'s medical records and the autopsy report in her "medical child death review" and determined whether K.S.N.'s death was an accident or the result of abuse and neglect.

Dr. Hodgson highlighted certain items in K.S.N.'s medical history. In June 2002, he suffered a "fairly significant" bruise injury to his left thigh, for which he was x-rayed. No information was provided as to how the injury occurred. Hodgson labeled the injury "unusual." In September 2002, K.S.N. was admitted to the hospital for three days following a closed head injury, including a concussion with loss of consciousness, along with post-concussive symptoms of right side body weakness and ataxia, or wobbly gait.

N.S. had reported the child ran into a wall. Dr. Hodgson opined the explanation was inconsistent with the injuries displayed, which were more consistent with a rotational injury to the head. Finally, on May 9, 2003, N.S. took K.S.N. to his pediatrician the day following a motor vehicle accident because he complained of pain in his right elbow and back. Dr. Hodgson questioned the delay in seeking treatment for the child, as N.S. was taken to the emergency room on the day of the accident.

Regarding the lethal injury, Dr. Hodgson reviewed the first aid squad report, which noted K.S.N. had bruises on his right forehead and cheek. The autopsy report also identified: bruising on the child's face below his eye and on the left side of his neck, just underneath his jaw; abrasions beneath his umbilicus (belly button) and in his right lower quadrant; a two-inch by one-inch area of bruising on his back; and external trauma visible on a number of areas on his body. Dr. Hodgson characterized the facial, neck, and back bruising as "unusual" for horseplay between children. Internally, K.S.N. suffered severe localized blunt force abdominal trauma, "which led to [a] rupture in an area of the small bowel when this loop of bowel was forcefully impinged onto the spine." The mesentery, a membrane that attaches organs to the abdominal wall, was torn as was the omentum, the large membrane that covers the internal organs of the abdomen. The jejunum, or middle section of the small intestine, was ruptured. Dr. Hodgson stated K.S.N.'s intestines suffered a full perforation, which is "difficult" to do. The coroner recorded 700ccs of blood and stool had leaked into the peritoneal cavity, which led to a "massive infection." The autopsy listed the manner of death as "homicide."

Hodgson stated the child's injuries were without question consistent with being punched by an adult and inconsistent with the suggested roughhousing or wrestling with K.A.N. Dr. Hodgson asserted the "velocity of force necessary in a blunt trauma ... was something that needed adult-size strength to cause," unless it was caused by some mechanical force such as a car accident or a fall from a second-story window. The expert dispelled the parents'

allegation that K.A.N. had jumped on K.S.N.'s stomach, in part because DYFS reported the two slept on mattresses on the floor, eliminating a high surface from which one child could have jumped onto the other, and also because, in her opinion, the younger boy lacked "the strength, velocity or weight" to inflict a lethal blow to his bigger, stronger brother's abdomen.

Dr. Hodgson explained the symptoms of peritonitis, stating the condition is "extremely painful." She noted a child suffering from peritonitis would likely be complaining of severe pain on a constant basis. When K.S.N. died, the infection was raging in his abdominal cavity and had entered his blood stream. She opined a "reasonably prudent" parent would have been able to distinguish between a stomach virus and peritonitis and, by no later than Monday morning, would know K.S.N. needed emergent medical care. The failure to provide timely medical care contributed to K.S.N.'s death, as he could have been helped had he been evaluated earlier.

Finally, J.N. testified regarding his relationship with K.S.N. and K.A.N. N.S. and R.B., who each faced pending criminal charges, did not testify or present witnesses.

The trial court issued its oral opinion on February 3, 2005. Determining the unrefuted evidence presented by the Division "clearly and convincingly" showed R.B. had inflicted the fatal blows to the child, and that N.S. and R.B. were responsible for K.S.N.'s death by failing to render timely and necessary medical treatment, the court concluded K.S.N. was an abused or neglected child, as defined by the statute.

On September 14, 2005, the court considered the Division's motion, joined by the Law Guardian, to be relieved of its statutory obligation to make reasonable efforts to reunite the family. *N.J.S.A.* 30:4C–11.3(b). The court found aggravating circumstances existed and granted the Division's request, concluding "no level of supervision in this case would be sufficient to protect these children." Legal and physical custody of the two children were

placed with their maternal grandmother, and visitation with N.S. and R.B. was temporarily suspended.

On September 27, 2005, K.B. was born following N.S. and R.B.'s April 19, 2004 marriage. Before the baby was released from the hospital, DYFS filed an order to show cause and moved for custody, alleging the infant was at substantial risk of harm. The court granted the Division's motion.

A dispositional hearing was held on October 25, 2005. After the hearing, K.A.N. was placed in the custody of his father, J.N., who was required to continue to live with his parents.

Concerns for J.B. and K.B. developed when their maternal grandmother's marijuana use was discovered. The children were again placed in foster care, and DYFS began reviewing alternative relative placements. Finding none, and after a substance abuse evaluation and two negative urine screens, J.B. and K.B. were returned to their grandmother's care on January 25, 2006.

On February 7, 2006, J.N. was dismissed from the litigation. N.S. was permitted visitation with K.A.N. only as supervised by J.N. DYFS moved to amend the order relieving it of the obligation to provide reasonable efforts to reunite the infant with her parents, which was also granted. The Division also advised it sought to amend its complaint to allow kinship legal guardianship (KLG) of J.B. and K.B. by their grandmother. This too was granted. On June 7, 2006, R.B. and N.S. consented to KLG. A risk assessment was ordered to determine whether to allow J.B. and K.B. to visit with their parents. At the final dispositional hearing held on September 11, 2006, the judge determined N.S. and R.B. could visit with the two children under the supervision of the children's grandmother. The litigation was terminated, and appeals were filed by N.S. and R.B. on October 20 and October 31, 2006, respectively. The cases were consolidated for the purpose of sharing transcripts.

Thereafter, this court entered a limited remand to allow N.S. and R.B. to move for relief, pursuant to *Rule* 4:50. Following his

review, the Family Part judge denied the motions on April 10, 2008. On February 6, 2009, we granted the Law Guardian's request to include in the record R.B.'s judgment of conviction for the second-degree offenses of reckless manslaughter, endangering the welfare of a child by causing physical injury, and endangerment for failure to seek timely medical care in the death of K.S.N., "without prejudice to the parties' arguments as to whether or to what extent it may be considered in [the court's] determination of the merits of the appeal."

On March 16, 2009, N.S. pled guilty to third-degree child endangerment by failing to get K.S.N. timely medical treatment. The Law Guardian's motion to include that judgment of conviction was granted. Pending before us is N.S.'s motion to supplement the record with the transcript of her plea and her affidavit of explanation for why she pled guilty to the endangerment charge. We grant that motion and have considered her submission.

## II.

"Whether a parent or guardian has failed to exercise a minimum degree of care" in protecting a child is determined on a case-by-case basis and "analyzed in light of the dangers and risks associated with the situation." *G.S. v. Dep't of Human Servs.*, 157 *N.J.* 161, 181–82, 723 *A.*2d 612 (1999). We note *N.J.S.A.* 9:6–8.21(a) defines the terms parent or guardian to include "any person [ ] who has assumed responsibility for the care, custody or control of a child or upon whom there is a legal duty for such care." Also, *N.J.S.A.* 9:6–2 provides that a " 'person having the care, custody or control of any child' " includes "any person with whom a child is living at the time the offense is committed."

An " '[a]bused or neglected child' " is defined at *N.J.S.A.* 9:6–8.21(c) to include a child whose parent or guardian

(2) creates or allows to be created a substantial . . . risk of physical injury to such child by other than accidental means which would likely cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ;

(4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care .... (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]

A finding of abuse or neglect must be based on a preponderance of the evidence and "only competent, material and relevant evidence may be admitted." *N.J.S.A.* 9:6–8.46(b)(2). "Under the preponderance standard, 'a litigant must establish that a desired inference is more probable than not. If the evidence is in equipoise, the burden has not been met.'" *Liberty Mut. Ins. Co. v. Land,* 186 *N.J.* 163, 169, 892 *A.2d* 1240 (2006) (quoting Biunno, *Current N.J. Rules of Evidence,* comment 5a on *N.J.R.E.* 101(b)(1) (2005)). "The evidence must demonstrate that the offered hypothesis is a rational inference, that it permits the trier[ ] of fact to arrive at a conclusion grounded in a preponderance of probabilities according to common experience." *In re Estate of Reininger,* 388 *N.J.Super.* 289, 298, 907 *A.2d* 1024 (Ch.Div.2006) (citing *Joseph v. Passaic Hosp. Ass'n,* 26 *N.J.* 557, 574–75, 141 *A.2d* 18 (1958)). If the facts are sufficient to sustain the complaint, the court will enter an order finding that the child is an abused or neglected child and set forth the ground for such finding. *N.J.S.A.* 9:6–8.50(a).

Generally, "the phrase 'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." *G.S., supra,* 157 *N.J.* at 178, 723 *A.2d* 612. "Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." *Ibid.* (citing *McLaughlin v. Rova Farms, Inc.,* 56 *N.J.* 288, 305, 266 *A.2d* 284 (1970)). Wanton and willful behavior is "an 'intermediary position between simple negligence and the intentional infliction of harm[,]'" *id.* at 179, 723 *A.2d* 612 (quoting *Foldi v. Jeffries,* 93 *N.J.* 533, 549, 461 *A.2d* 1145 (1983)), and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict

injury.'" *Id.* at 178, 723 *A.*2d 612 (quoting *McLaughlin, supra,* 56 *N.J.* at 305, 266 *A.*2d 284). "[N]on-intentional conduct is sufficient to warrant a finding of abuse if injury to the child is demonstrated." *Division of Youth & Family Servs. v. S.S.,* 372 *N.J.Super.* 13, 24, 855 *A.*2d 8 (App.Div.2004) (citing *G.S., supra,* 157 *N.J.* at 175–82, 723 *A.*2d 612), *certif. denied,* 182 *N.J.* 426, 866 *A.*2d 983 (2005). "[T]he inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger." *G.S., supra,* 157 *N.J.* at 182, 723 *A.*2d 612. "When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." *Ibid.*

The trial court "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." *Division of Youth & Family Servs. v. E.P.,* 196 *N.J.* 88, 104, 952 *A.*2d 436 (2008) (citing *Division of Youth & Family Servs. v. M.M.,* 189 *N.J.* 261, 293, 914 *A.*2d 1265 (2007)) (internal quotations omitted). Accordingly, "in reviewing the factual findings and conclusions of a trial judge, we are obliged to accord deference to the [ ] court's credibility determination ... based upon ... [the] opportunity to see and hear the witnesses." *Division of Youth & Family Servs. v. R.L.,* 388 *N.J.Super.* 81, 88, 906 *A.*2d 463 (App.Div.2006) (citing *Cesare v. Cesare,* 154 *N.J.* 394, 411–12, 713 *A.*2d 390 (1998)), *certif. denied,* 190 *N.J.* 257, 919 *A.*2d 850 (2007).

We also recognize the special expertise of those judges assigned to the Family Part. *Cesare, supra,* 154 *N.J.* at 412–13, 713 *A.*2d 390. The judgment of a trial court in a family-related matter "'should not be overthrown except upon the basis of a carefully reasoned and factually supported ... determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest

denial of justice.'" *In re Adoption of a Child by P.F.R.*, 308 *N.J.Super.* 250, 255, 705 *A.2d* 1233 (App.Div.1998) (quoting *Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 597–98, 379 *A.2d* 225 (1977)); *In re Guardianship of J.T.*, 269 *N.J.Super.* 172, 188, 634 *A.2d* 1361 (App.Div.1993) (quoting *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 483–84, 323 *A.2d* 495 (1974)).

▮ "However, where the focus of the dispute is ... alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom, the traditional scope of review is expanded." *M.M., supra*, 189 *N.J.* at 279, 914 *A.2d* 1265 (internal quotations and citations omitted). "[E]ven in those circumstances[,] we will accord deference unless the trial court's findings went so wide of the mark that a mistake must have been made." *Ibid.*

Governed by these standards, we review the various challenges presented by N.S. and R.B. When appropriate, we have combined similar challenges proffered by each parent.

## III.

▮ For simplicity, we collectively refer to R.B. and N.S. as defendants, particularly when the arguments raised in each separate appeal are identical. Otherwise, we will individually identify an argument raised by only one party. In her first point, N.S. raises a preliminary procedural question. She argues she should be permitted to appeal the finding of abuse and neglect and the resultant removal of J.B. and K.B., notwithstanding her consent to an order for KLG that ended the litigation with respect to these children. Neither N.S. nor R.B. appealed from the final order awarding KLG. Yet each challenges the sufficiency of the evidence supporting the trial court's findings of abuse and neglect. We review the procedural issue presented.

N.S. maintains that, although she accepts the KLG determination, she never assented to the abuse and neglect finding. Additionally, she notes she appealed from the February 7, 2006 order

transferring custody of K.A.N. to J.N. Thus, N.S. suggests, if she can challenge the abuse finding for purposes of K.A.N.'s custodial determination, she should be permitted to challenge the dispositional orders relating to J.B. and K.B.

*Rule* 2:2–3(a)(1) allows an appeal as of right only from "final judgments" of the Superior Court's trial divisions. "In actions initiated in accordance with Title [Nine] alleging abuse or neglect of a child, the Legislature has also declared that an appeal may be taken as of right from any final order made pursuant to the act." *Division of Youth & Family Servs. v. L.A.*, 357 *N.J.Super.* 155, 163, 814 *A.*2d 656 (App.Div.2003)(citing *N.J.S.A.* 9:6–8.70).

"[T]he statutory framework of Title Nine provides that upon a finding of abuse and neglect, the offending parent or guardian is entitled to a dispositional hearing to determine whether the children may safely return to his or her custody, and if not, what the proper disposition should be." *Division of Youth & Family Servs. v. G.M.*, 198 *N.J.* 382, 387–88, 968 *A.*2d 698 (2009).

If the court makes a finding of abuse or neglect, it shall determine, based upon the facts adduced during the fact-finding hearing, and upon any other facts presented to it, whether a preliminary order pursuant to [*N.J.S.A.* 9:6–8.31] is required to protect the child's interests pending a final order of disposition.

[*N.J.S.A.* 9:6–8.50(d).]

Thus, a factfinding order, such as the one sought to be examined in this appeal, is considered interlocutory and requires a motion for leave to appeal. *L.A., supra*, 357 *N.J.Super.* at 164–65, 814 *A.*2d 656. Here, no request for leave to appeal was filed following either the February 3, 2005 order making findings, pursuant to *N.J.S.A.* 9:6–8.21(c), or the June 7, 2006 consent order granting KLG.

We have held that "[a] party may not seek appellate review of an adverse interlocutory order without seeking relief from the outcome of the litigation as embodied in the judgment." *Magill v. Casel*, 238 *N.J.Super.* 57, 62, 568 *A.*2d 1221 (App.Div. 1990); *see also R.* 2:5–6 (governing appeals from interlocutory orders). Moreover, a judgment or order entered with the consent

of the parties is ordinarily not appealable for the purpose of challenging its substantive provisions. *Spedick v. Murphy,* 266 *N.J.Super.* 573, 593, 630 *A.2d* 355 (App.Div.), *certif. denied,* 134 *N.J.* 567, 636 *A.2d* 524 (1993); *see Winberry v. Salisbury,* 5 *N.J.* 240, 255, 74 *A.2d* 406 (stating an order consented to by the attorneys for each party is not appealable), *cert. denied,* 340 *U.S.* 877, 71 *S.Ct.* 123, 95 *L.Ed.* 638 (1950); *Infante v. Gottesman,* 233 *N.J.Super.* 310, 318–19, 558 *A.2d* 1338 (App.Div.1989) (holding plaintiff could not appeal from summary judgment that dismissed his claims, to which he consented); Pressler, *Current N.J. Court Rules,* comment 2.2.3 on *R.* 2:2–3(a)(1) (2010) (stating a party cannot consent to a certain course of action and later claim error in that procedure). Thus, a litigant who is satisfied with a final judgment cannot thereafter obtain an advisory appellate determination regarding an alleged interlocutory error. *Magill, supra,* 238 *N.J.Super.* at 62, 568 *A.2d* 1221.

Despite this generally sound procedure, its application is unsatisfactory in this instance and in other Title Nine matters. To suggest litigants must request leave to appeal factfinding orders entered early in the proceeding, or be forever barred from challenging them if the litigation ends acceptably, ignores the significant consequences flowing from an adverse finding of abuse and neglect.

Unlike other civil actions where a monetary award may be the desired result of a judgment, significant and longstanding implications attach to a finding of abuse and neglect. First, an adverse determination could affect parents' " 'constitutionally protected right to maintain a relationship with their children.' " *G.M., supra,* 198 *N.J.* at 397, 968 *A.2d* 698 (quoting *M.M., supra,* 189 *N.J.* at 279, 914 *A.2d* 1265). Second, in addition to these custodial ramifications, numerous collateral consequences flow from such a finding. Specifically, a finding of abuse and neglect is forwarded by the Division to a central registry maintained by the Department of Children and Families (DCF). *N.J.S.A.* 9:6–8.11; *Department of Youth & Family Servs. v. J.L.,* 410 *N.J.Super.* 159, 170,

980 *A.*2d 488 (App.Div.2009); *S.S., supra,* 372 *N.J.Super.* at 27, 855 *A.*2d 8. On written request, the records may be released to individuals identified in the statute, "including doctors, courts, child welfare agencies, and any person or entity mandated by statute to consider child abuse or neglect information when conducting a background check or employment-related screening of an individual . . . seeking employment with an agency or organization providing services to children[.]" *G.S., supra,* 157 *N.J.* at 169 n. 2, 723 *A.*2d 612 (citing *N.J.S.A.* 9:6–8.10a(b)(1)–(2[2] )); *see also N.J.S.A.* 9:6–8.10e (requiring DCF to conduct a check of its child abuse registry for each person seeking registration as a professional guardian); *N.J.S.A.* 30:5B–25.3 (requiring child abuse registry check for applicants seeking daycare facility licensure).

 Granting leave to appeal from the interim finding is unnecessarily disruptive and unreasonably causes delay in the dispositional review and family reunification, which is often the desired outcome of Title Nine litigation. We foresee instances where the interests of justice demand a litigant's ability to challenge an interim finding for which leave to appeal was not sought, notwithstanding an acceptable final order closing the litigation. For example, despite a finding of neglect, a court could properly conclude the matter by allowing the children to return home once dispositional services are completed by the offending parents. Nevertheless, the parents might justifiably seek to challenge the court's interim finding.

 In balancing the competing concerns posed when a parent's rights in respect of their children are challenged by the State's exercise of its *parens patriae* responsibility to protect the health and welfare of those children, provision for relief must be permitted. *N.J.S.A.* 30:4C–4; *Division of Youth & Family Servs. v. G.L.,* 191 *N.J.* 596, 605, 926 *A.*2d 320 (2007). As the consequences of an adverse factfinding determination often are distinctly different from those of a final dispositional order, we conclude it is necessary to set forth a process, which allows parents the opportunity to fully preserve their rights, yet allows the Division

to expeditiously proceed with disposition of the Title Nine matter for the benefit of the family and, more importantly, the interests of the children the action is intended to serve. Therefore, we conclude defendants in these actions should reserve the right to challenge any interlocutory finding of abuse or neglect notwithstanding their agreement to an acceptable resolution of the litigation.

Although defendants did not expressly reserve their right to appeal the abuse and neglect findings before agreeing to the KLG disposition with respect to J.B. and K.B., we conclude they may challenge those findings in this appeal. N.S.'s appeal from the transfer of custody of K.A.N. permits our review of the underlying abuse and neglect findings. Moreover, the parents each filed amended appeals from their respective *Rule* 4:50 motions. Our review of that determination also implicates our review of the initial finding, pursuant to *N.J.S.A.* 9:6–8.21(c).

## IV.

We now examine a series of arguments advanced by defendants attacking the sufficiency of the evidence relied upon by the trial court to determine that (1) they abused or neglected K.S.N. causing or contributing to his death; (2) the Division proved aggravating circumstances relieving it of its obligation to provide reasonable efforts to assure reunification, *N.J.S.A.* 30:4C–11.3(a); and (3) custody of K.A.N. should be transferred to J.N.

Defendants contend the use of K.A.N.'s statements to Detective Zuppa in the factfinding hearing was error. K.A.N. did not appear; his statements were testified to by Jankowski and Dr. Hodgson. Defendants challenge the trial court's acceptance of and reliance upon these statements, asserting they "were the product of highly suggestive and improper questioning techniques." Specifically, defendants identify responses they suggest were tainted by leading questions and speculate that Jankowski and Detective Zuppa planted the idea that R.B. punched K.S.N. prior to commencement of the taped interview. Additionally,

defendants assert the Division's failure to release a transcript of Detective Zuppa's interrogation, in favor of relying on Jankowski's account of the child's statements, was severely prejudicial.[3] Finally, R.B. argues Dr. Hodgson's testimony was inadmissible as she was not competent to review the autopsy report and her conclusions were "rife with inaccuracies." We reject each of these contentions.

At trial, neither defendant lodged an objection to the admissibility of Jankowski's testimony relating the child's statements. Therefore, our review of this argument is guided by the plain error standard set forth in *Rule* 2:10–2. *Tartaglia v. UBS PaineWebber, Inc.*, 197 *N.J.* 81, 128, 961 *A.*2d 1167 (2008) (citing *Fertile v. St. Michael's Med. Ctr.*, 169 *N.J.* 481, 493, 779 *A.*2d 1078 (2001)). The mere possibility of error is insufficient for reversal. We must determine whether, in the interests of justice, the cited error had the " 'clear capacity for producing an unjust result.' " *Ibid.* (quoting *Fertile, supra,* 169 *N.J.* at 493, 779 *A.*2d 1078); *R.* 2:10–2.

" 'Traditional rules of appellate review require substantial deference to a trial court's evidentiary rulings.' " *Benevenga v. Digregorio*, 325 *N.J.Super.* 27, 32, 737 *A.*2d 696 (App.Div. 1999) (quoting *State v. Morton*, 155 *N.J.* 383, 453, 715 *A.*2d 228 (1998)), *certif. denied*, 163 *N.J.* 79, 747 *A.*2d 287 (2000). Absent a manifest denial of justice, we do not disturb a trial judge's reasoned exercise of his or her broad discretion when making relevance and admissibility determinations. *Lancos v. Silverman*, 400 *N.J.Super.* 258, 275, 946 *A.*2d 1073 (App.Div.), *certif. denied sub nom.* *Lydon v. Silverman*, 196 *N.J.* 466, 957 *A.*2d 1174 (2008).

---

[3] At the time of the factfinding hearing, the Prosecutor's Office declined to release K.A.N.'s statement taken by Zuppa, pending conclusion of its investigation. The transcript was supplied to defendants in July 2005, many months after the factfinding hearing.

Defendants rely solely on *State v. Michaels*, 136 *N.J.* 299, 312, 642 *A.*2d 1372 (1994), in which the Court concluded the use of coercive and highly suggestive interrogation techniques created a significant risk of distorting a child's recollection of events, undermining the reliability of the child's statements and subsequent testimony. In *Michaels*, the Court concluded "[i]f a child's recollection of events has been molded by an interrogation, that influence undermines the reliability of the child's responses as an accurate recollection of actual events." *Id.* at 309, 642 *A.*2d 1372. Examples of egregious violations found to violate proper interview protocol include: "the absence of spontaneous recall, interviewer bias, repeated leading questions, multiple interviews, incessant questioning, vilification of defendant, ongoing contact with peers and references to their statements, and the use of threats, bribes and cajoling, as well as the failure to videotape or otherwise document the initial interview sessions." *Id.* at 321, 642 *A.*2d 1372. In this matter, defendants suggest "[m]ost of the[se] improper practices condemned by the ... [C]ourt in the *Michaels* case were employed in this matter with respect to the questioning of [K.A.N.]."

We agree that K.A.N.'s interview comments alone could not sustain a finding of abuse and neglect. *N.J.S.A.* 9:6–8.46(a)(4) provides that "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." We also concur with the suggestion that, at times, K.A.N.'s responses included inaccuracies and fantasy.

Nevertheless, we reject defendants' argument that the child's interview was tainted, along with the notion that K.A.N.'s statements implicating R.B. were the only evidence supporting the court's abuse and neglect findings. We conclude that, to the extent K.A.N.'s statement was considered by the trial court, it was proper to do so.

In his opinion following factfinding, the trial judge stated:

[K.A.N.'s] disclosure in his interview by the Prosecutor's office reports that [K.S.N.] was punched in the stomach by [R.B.] This information among all information sent to [the] Child Protection Center for review, offers a possible mechanism of injury that could account for the force necessary to cause lethal abdominal injury and to cause the other noted skin abrasions and bruising.

Contrary to defendants' contentions, the judge's mention of K.A.N.'s disclosure does not make it "the sole evidence presented as to the charge of abuse and neglect." Actually, the trial court's opinion extensively credited and relied upon Dr. Hodgson's uncontroverted expert testimony regarding the cause of K.S.N.'s injuries. The judge stated:

Just to repeat that. Within a reasonable degree of medical certainty, [Dr. Hodgson] feels that the blunt force trauma was caused by an inflicted injury by an adult. She also indicated that the velocity of the force necessar[il]y would come from an adult. And the parties should have known by Sunday evening to get help.

The injury was to the small intestine, which is difficult to perforate. The injury would be caused by pushing the intestine into the spinal column. The blunt force trauma can be caused by accidental means such as a car accident or high fall....

. . . .

He was not in a motor vehicle accident, had not fallen from a second story window. He had significant bruising on his face, on his abdomen, under the umbilicus, and under his skin, on his back as well as his lethal internal abdominal blunt force injuries,—someone with adult strength inflicted those injuries.

We conclude that, to the extent K.A.N.'s statement was considered, it was proper.

The court also addressed defendants' actions in response to K.S.N.'s symptoms of distress. The judge repeated the expert's testimony listing the autopsy findings of the breadth of the infection resulting from the ruptured intestine, and the symptoms of peritonitis. Again relying on Dr. Hodgson's testimony, he stated:

She goes on to say, it is our further opinion that [K.S.N.] died from his abdominal injuries because the paramour and his mother delayed in obtaining timely medical care for him, given the findings [of peritonitis] in the abdominal cavity. At the time of the autopsy this child had full[-]blown peri[ ]tonitis, diffuse infection for many hours prior to his death.... By March 29[ ], 2004[, K.S.N.] would have had significant pain and limitation of mobility. He would have had fever by the morning of March 29[ ], 2004.

We know his vomiting [ ] started on the evening of March 27[ ], 2004. Again that is consistent with the records as well as intra-abdominal infection became rampant

[sic]. Without timely medical care, peritonitis is lethal.... Yet, no adult caregiver called 911 to transport him to the emergency room[.]

Without question, Dr. Hodgson's testimony, which was consistent with the emergency medical reports of extensive bruising over the child's body, provided the principal basis of the court's specific finding that K.S.N.'s injuries "were a result of blunt force trauma inflicted by [R.B.]" Likewise, the expert's description of the severe symptoms of distress ignored by the adults, gleaned from the autopsy results, supported the finding of defendants' failure to obtain necessary medical intervention.

The injuries sustained by K.S.N. and the existence of peritonitis were of such "a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian" and admissible as "prima facie evidence that a child ... is an abused or neglected child[.]" *N.J.S.A.* 9:6–8.46(a)(2). Further, the statute supports the court's decision to remove K.A.N. and J.B. relying on the proofs evincing the abuse or neglect of K.S.N. *N.J.S.A.* 9:6–8.46(a).

Finally, we note the factual questions decided in the criminal case were identical to those determined in this proceeding. R.B. was convicted following a jury trial. N.S. pled guilty, and the reasons she recites for entering that plea do not change the fact that she admitted failing to secure timely medical care for her child. Defendants' respective criminal convictions in the death of K.S.N. collaterally estop any asserted claims of innocence. *In re Guardianship of J.O.*, 327 *N.J.Super.* 304, 309, 743 *A.*2d 341 (App.Div.), *certif. denied*, 165 *N.J.* 492, 758 *A.*2d 651 (2000).

The remaining contentions not otherwise addressed, including those challenging Dr. Hodgson's expertise, are determined to lack sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E). Accordingly, we conclude no error is presented, and the trial court's findings of abuse and neglect are amply supported by the credible evidence in the record.

██ Defendants also maintain that factual inaccuracies recited by Dr. Hodgson were relied upon by the court to improperly find aggravating circumstances, pursuant to *N.J.S.A.* 30:4C–11.3(a), thereby relieving DYFS from the obligation to provide further services to reunite the family. Relying on the trial evidence discussed above, we disagree.

DYFS is mandated to "make reasonable efforts ... to preserve the family in order to prevent the need for removing the child from his home" and, once a child is removed, "the [D]ivision shall make reasonable efforts to make it possible for the child to safely return to his home." *N.J.S.A.* 9:6–8.8(b)(2). However, if a trial court finds abuse and neglect occurred under "aggravated circumstances," the Division is relieved of the requirement to make such reasonable efforts to reunify an abused or neglected child with his or her parents. *N.J.S.A.* 30:4C–11.3(a).

In *Division of Youth & Family Servs. v. A.R.G.,* 361 *N.J.Super.* 46, 77, 824 *A.2d* 213 (App.Div.2003), *aff'd in part and mod. in part,* 179 *N.J.* 264, 845 *A.2d* 106 (2004), we articulated what constitutes "aggravated circumstances," stating

any circumstances that increase the severity of the abuse or neglect, or add to its injurious consequences, equates to "aggravated circumstances." ... [W]here the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety and welfare of the child, they are "aggravated" to the extent that the child welfare agency ... may bypass reasonable efforts of reunification. Moreover, where the parental conduct is particularly heinous or abhorrent to society, involving savage, brutal, or repetitive beatings, torture, or sexual abuse, the conduct may also be said to constitute "aggravated circumstances."

In this matter, the trial judge applied the test thereafter set forth by the Supreme Court to make such a determination. *A.R.G., supra,* 179 *N.J.* at 284, 845 *A.2d* 106. The trial court found (1) each parent committed acts of abuse and neglect; (2) the acts were severe and led to K.S.N.'s death when R.B. and N.S. delayed in obtaining medical treatment; and (3) even though the other children were not victims, the treatment of this one child could not be viewed "in a vacuum, separate and apart from the other children." Therefore, because R.B. inflicted the abuse and he, along with N.S., "ignored the face of mounting serious medical

problems ... in delaying ... treatment," the court concluded "no level of supervision in this case would be sufficient" to protect K.A.N., J.B. and, later, K.B.

We concur with the court's determination that defendant's actions regarding the circumstances of K.S.N.'s death were so severe as to relieve the Division of its obligation to reunite this family. R.B.'s conduct was confirmed by his criminal conviction. His uncontrollable anger and severe lack of judgment created a very high risk to the children's welfare. N.S.'s apparent lack of urgency in assuring the provision of appropriate medical care for her distressed five-year-old son, along with her indifference toward protecting the other young children from the danger posed by R.B., displayed a mindset unlikely to change with services. Even now, R.B. denies he committed any wrongdoing, and N.S. does not accept that R.B. punched K.S.N., believing instead K.A.N. was to blame. These entrenched attachments to unsupportable events reveal the futility of providing services, a conclusion properly reached by the trial judge.

In a related argument, N.S. asserts the evidence does not support the trial court's decision to place K.A.N. in his father's custody, subject to her visitation at J.N.'s discretion. She seeks reversal of the custody order, which she suggests was "tantamount to terminating her parental rights," or, alternatively, its amendment to require DYFS to supervise J.N.'s care of the child and grant her visitation rights.

The court fully aired J.N.'s parental fitness, past substance abuse, and criminal history. The record reflects that from the time J.N. learned of K.S.N.'s death, he fully cooperated with the Division in an effort to foster a relationship with and gain custody of K.A.N. J.N. attended psychological and bonding evaluations, submitted to substance abuse assessments, and completed parenting classes. He consistently attended supervised visitation, and his time with the child was gradually increased to include overnights. J.N. also assured K.A.N.'s participation in therapy and visitation with his siblings.

During the October 25, 2005 dispositional hearing, the court considered the testimony of Chester Sigafoos, Ph.D., who opined J.N. was able to provide "nurturing, protection, stability and guidance" for his son and, with monitoring, was capable of effectively parenting K.A.N., and assuring the child maintained his sibling relationships. Relying on this expert evidence, the court concluded K.A.N. could not be safely released to the custody of his mother and that the child's "interest in permanency" was best achieved by granting J.N.'s request for custody, subject to continued residence with his parents and DYFS's continued involvement.[4] *N.J.S.A.* 9:6–8.51; *N.J.S.A.* 9:6–8.54(a).

That conclusion, amply supported when it was made, has withstood the test of time. J.N. continued K.A.N.'s counseling, not only to address his brother's death but to process his mother's belief in R.B.'s contention blaming K.A.N. Additionally, J.N. has supported the child, who appeared as a witness for the State in R.B.'s criminal trial. To date, no concerns have surfaced regarding K.A.N.'s placement. The Division found K.A.N. was properly provided for and "doing great" in J.N.'s care.

At argument, we explored the issue of visitation, inquiring whether N.S. sought the court's intervention to obtain visitation. N.S. admitted she had not filed any visitation requests before appealing the September 11, 2006 order allowing J.N., at his discretion, to allow supervised visits with K.A.N.[5] We are aware of no impediment to her making this request, which is better suited for review by the Family Part. *Beck v. Beck*, 86 *N.J.* 480, 498–99, 432 *A.*2d 63 (1981).

In summary, we discern no issue with the trial court's reasoned exercise of discretion in granting J.N.'s request for custody of his

---

4 The restrictions on the child's custodial placement were removed in the February 7, 2006 order that dismissed J.N. from the litigation.

5 N.S. does not disclose whether the final restrictions on her contact with K.A.N. result from her criminal conviction. The proposed plea agreement included that she have no contact with K.A.N.

son following a dispositional hearing. *See G.M., supra,* 198 *N.J.* at 387–88, 968 *A.*2d 698. We also perceive no prejudice to N.S.'s right to request visitation.[6]

## V.

 In Point Three, N.S. and R.B. argue their right to counsel, required by *N.J.S.A.* 9:6–8.43, was violated both at the initial removal hearing and again at the hearing removing K.B. after her birth. Defendants argue no child may be removed from his or her parents' care and custody until legal representation is provided. We are not persuaded.

The Division's authority to secure the initial removal of K.A.N. and J.B. without the consent of N.S. and R.B. or a court order was pursuant to the provisions of *N.J.S.A.* 9:6–8.29. The statute places in DYFS the responsibility to act when "continuance in . . . the care and custody of the parent or guardian presents an imminent danger to the child's life, safety or health, and there is insufficient time to apply for a court order[.]" *Ibid.* On learning the preliminary cause of K.S.N.'s death—blunt force trauma to his stomach causing laceration of his intestines—DYFS possessed a sound basis for the emergency removal of the two remaining children.

With respect to K.B., removal was upon application to the court on September 29, 2005. Although the court ordered the child's removal based on the prior finding of abuse and neglect in the death of K.S.N., the judge accepted defendants' urging to allow K.B. to remain in the hospital until the Division completed any necessary investigation to assure placement in the care of N.S.'s mother.

In these two instances, defendants do not challenge the Division's compliance with the notice provisions of *N.J.S.A.* 9:6–8.30(a).

---

[6] Apparently, N.S. has been granted visitation with K.A.N. every other weekend from Friday through Sunday, supervised by N.S.'s mother.

They admit DYFS advised them to appear in court regarding the removal requests and, on the respective hearing dates, defendants appeared as instructed by the notice of removal. The challenge is that they appeared alone, without counsel.

At the initial removal hearing held on March 31, 2004, the trial judge advised defendants of their right to obtain counsel. Legal representation was then assigned for each parent through the Parental Representation Unit of the State Public Defender's Office (PRU). During the hearing regarding J.B.'s removal, R.B. made mention of the need for legal representation. The trial judge mistakenly believed the Division filed a separate action, rather than merely amending the previously filed complaint. When the issue was clarified, the court inquired whether defendants sought the continued representation of trial counsel. N.S. replied she wanted to replace her attorney and said defendants were seeking private counsel. R.B. affirmed he did not want his prior counsel to continue. Under these circumstances, the court's actions were very appropriate.

Defendants next argue the court violated *N.J.S.A.* 9:6–8.43 when it failed to advise them they could request an adjournment until counsel appeared and suggest their children should not have been removed until and unless they actually had secured or waived legal representation. We disagree.

The initial hearing presented DYFS's complaint and order to show cause, which required judicial review of the justification for removal to assure the protection and best interests of the minor children. Specifically, the court examined whether reasonable efforts to prevent the children's placement were made. *N.J.S.A.* 30:4C–11.1. Finding DYFS made the threshold showing supporting removal, the court allowed the children's foster placement, granted DYFS the ability to secure their medical care, mandated the continued search for a relative placement, appointed a Law Guardian, reiterated defendants' right to secure counsel, and scheduled a hearing date. The order allowed any party to seek dissolution or modification of the provisions upon two days' notice.

The three parents all appeared on the return date of the order to show cause, represented by counsel. Similarly, on the return date after J.B.'s removal, defendants secured legal representation.

The "safety of the child shall be of paramount concern" to the court at the initial hearing. *N.J.S.A.* 9:6–8.31(a). Here, the court correctly weighed the best interests of the children in deciding whether removal was appropriate. *In re Adoption of Children by G.P.B.*, 161 *N.J.* 396, 405, 736 *A.*2d 1277 (1999). We determine sufficient "good cause" was shown to support entry of the preliminary order of protection and removal of the children. *N.J.S.A.* 9:6–8.31(c). This relief would have been appropriately ordered even if the parents knew of and had requested an adjournment. *See N.J.S.A.* 9:6–8.43(a) (allowing the court to grant temporary relief as appropriate under the law).

As to the alternative suggestion that the court refrain from acting until defendant's counsel is present, we rely on the Supreme Court's reasoning in rejecting a similar argument advanced by a criminal defendant, interviewed by DYFS in its protective services investigation, who argued he was entitled to counsel when a DYFS caseworker conducts a child abuse investigation. The Court stated:

> In our view, acceptance of defendant's argument would shift the primary focus of Title Nine from the right of children to be protected from abuse and neglect to the right of parents to the custody of their children. Those rights are not in equipoise. Only when the family can be rehabilitated and the children safely returned can the parents' rights be fully realized. There is in these cases a complex of interests to be considered, suggesting to a court that some caution is appropriate.... We decline to tip the balance by requiring additional protections for the parents of abused children to be imported from our criminal jurisprudence into Title Nine proceedings.
>
> [*State v. P.Z.*, 152 *N.J.* 86, 112, 703 *A.*2d 901 (1997).]

Accordingly, we have no quarrel with the judge's decision to remove K.A.N. and J.B. at the inception of this matter when he learned K.S.N.'s death resulted, at best, from lapsed parental supervision or, at worst, from adult-inflicted injury. K.B.'s removal was properly grounded upon the prior findings of abuse and neglect and demonstrated aggravated circumstances.

 We also find no procedural violations in the provision of counsel shortly after the initial removal. *See Division of Youth & Family Servs. v. B.H.*, 391 *N.J.Super.* 322, 345–46, 918 *A.2d* 63 (App.Div.), *certif. denied*, 192 *N.J.* 296, 927 *A.2d* 1294 (2007). Here the court's mention of the right to counsel, coupled with the Division's provision of written notice at the time removal was effectuated, adequately informed defendants. We reiterate that trial judges have a duty to assure that defendants in these proceedings are keenly aware of their right to have counsel, and to seek an adjournment if desired. We discern no constitutional deprivation is presented under these facts and conclude N.S. and R.B. were fully and effectively afforded counsel, "at all critical stages after formal proceedings have begun." *In re Guardianship of C.M.*, 158 *N.J.Super.* 585, 591, 386 *A.2d* 913 (Juv. & Dom. Rel. Ct.1978).

 Two additional issues are raised by defendants in support of their argument that their right to adequate legal representation was impaired. N.S. asserts she was denied the right to be represented by the counsel of her choice, as guaranteed by *N.J.S.A.* 9:6–8.43(a), and R.B. maintains he was denied effective assistance of counsel. We relate those additional facts necessary to provide context to these issues prior to examining defendants' arguments.

The litigation started on March 31, 2004, and the factfinding hearing began on October 13, 2004. N.S. was represented by PRU counsel. On November 30, 2004, Herbert Lawrence, N.S.'s criminal counsel, appeared requesting an adjournment of N.S.'s substitution of counsel motion when he learned all counsel had not been served [7] and that others, including N.S.'s Title Nine attorney, had not received his papers. Nevertheless, Lawrence requested the opportunity to "sit second chair" pending the motion return

---

[7] The motion reflects that the Deputy Attorney General on behalf of the Division was not included in the service list.

date. Counsel for DYFS and the Law Guardian opposed this request.

The court denied Lawrence's informal request for participation due to the procedural irregularities and the need to allow DYFS and the Law Guardian to review and respond to the motion, which he never served. He then appeared on February 3, 2005, orally moving to be substituted as counsel for N.S. during the dispositional hearing. The Division and the Law Guardian opposed the request and sought the opportunity to respond. The matter was adjourned to the next court date. N.S.'s attorney's request to adjourn disposition pending Lawrence's motion was denied.

The substitution motion was heard on June 9, 2005. The Law Guardian opposed Lawrence's representation because he also represented N.S. in the pending criminal investigation. The Law Guardian asserted Lawrence would gain access to the Division's records, including the children's treatment records, which were confidential.[8] Both the Law Guardian and the Division suggested Lawrence could assume N.S.'s representation only if he agreed to be barred from proceeding as counsel in any future civil or criminal matter.

After considering briefs and the arguments of counsel, the judge cited *N.J.S.A.* 9:6–8.10a, which states that child abuse records shall remain confidential and disclosed only under expressly authorized circumstances, and denied the motion, stating

> allowing Mr. Lawrence into the case where he would be given all these sensitive records and then possibly representing the defendant in a subsequent criminal proceeding, that the [c]ourt feels at this time that that would be, that is something that would be left for the criminal court at that time to determine whether these records, whether a portion of these records would be disclosed.
>
> But at this point in time to allow Mr. Lawrence into the case and to be given wholesale discovery, the [c]ourt feels that that is an unwarranted release of the records of the children, particularly the therapy records of the two remaining children at this time would be inappropriate.

---

[8] The Law Guardian specifically cited the need to maintain the confidentiality of the children's therapy records because the children were potential witnesses in the criminal proceeding.

N.S. does not allege her attorney was ineffective; rather, she asserts her efforts to secure her choice of counsel were thwarted, and this constitutional violation warranted reversal of the abuse and neglect finding. In support of her argument, N.S. asserts the Sixth Amendment guarantees a right to obtain counsel of her own choosing. *U.S. Const.* amends. VI, XIV; *see also N.J. Const.* art. I, § 10; *United States v. Bergamo*, 154 *F.*2d 31, 34 (3d Cir.1946).

■ We reject N.S.'s predicate argument that her Sixth Amendment right to counsel was implicated when the Family Part denied Lawrence's request for substitution. The Sixth Amendment safeguards an accused's right to counsel to defend a criminal prosecution. *U.S. Const.* amend. VI; *State v. Taccetta*, 200 *N.J.* 183, 192 n. 6, 975 *A.*2d 928 (2009). It is not applicable in this civil proceeding.

■ When faced with the temporary loss of parental rights, a parent's right to have legal representation is assured by the due process guarantee of Article I, paragraph 1 of the *New Jersey Constitution* and by *N.J.S.A.* 9:6–8.30(a). *See Division of Youth & Family Servs. v. R.G.*, 397 *N.J.Super.* 439, 448, 937 *A.*2d 1013 (2008) (reinforcing that for the State to temporarily or permanently deprive indigent parents of their children without providing counsel is a deprivation of due process), *overruled in part by G.M., supra,* 198 *N.J.* at 405, 968 *A.*2d 698; *E.B., supra,* 137 *N.J.* at 186, 644 *A.*2d 1093 (stating that parents charged with abuse and neglect of their children have a constitutional right to counsel).

■ The right to be represented, however, is not unbounded. Even in criminal cases, the right to representation by a specific attorney must be balanced against the requirements of the fair and proper administration of justice. *See United States v. Kikumura,* 947 *F.*2d 72, 78–79 (3d Cir.1991); *Davis v. Stamler,* 650 *F.*2d 477, 479–80 (3d Cir.1981); *United States v. Dolan,* 570 *F.*2d 1177, 1180–81 (3d Cir.1978); *United States ex rel. Carey v. Rundle,* 409 *F.*2d 1210, 1214 (3d Cir.1969), *cert. denied,* 397 *U.S.* 946, 90 *S.Ct.* 964, 25 *L.Ed.*2d 127 (1970). Thus, the right only requires a

fair opportunity to secure and consult competent counsel. *State v. Jimenez*, 175 *N.J.* 475, 484, 815 *A.*2d 976 (2003). These limitations apply equally to this matter.

Here, the concern in allowing dual representation by counsel centers on the disclosure of and access to DYFS files, released under *Rule* 5:12–3, to which the attorney representing a defendant is entitled. Criminal counsel would gain access to records that, by statute, are otherwise confidential due to the State's compelling interest in protecting its child abuse information.

██ This court has observed that when a child is a victim of abuse and neglect, which if proven is also a criminal offense, the "parallel investigations and proceedings by the Division and the county prosecutor have resulted in thorny constitutional issues." *Division of Youth & Family Servs. v. R.M.*, 347 *N.J.Super.* 44, 64, 788 *A.*2d 888 (App.Div.2001). "[C]ourts must weigh the conflicting constitutional rights of criminal defendants to a fair trial and the confrontation of witnesses, against the State's compelling interest in protecting child abuse information and records." *In re Z.W.*, 408 *N.J.Super.* 535, 539, 975 *A.*2d 938 (App.Div.2009) (citing *Pennsylvania v. Ritchie*, 480 *U.S.* 39, 59–61, 107 *S.Ct.* 989, 1002–03, 94 *L.Ed.*2d 40, 58–60 (1987)).

The Division's records regarding the abuse and neglect of a child are expressly made confidential. *N.J.S.A.* 9:6–8.10a(a); *Division of Youth & Family Servs. v. J.B.*, 120 *N.J.* 112, 126–27, 576 *A.*2d 261 (1990). "All records of child abuse reports . . . all information obtained by [DCF] in investigating such reports . . . and all reports of findings . . . shall be kept confidential and may be disclosed only under the circumstances expressly authorized" by the subsections of the statute. *N.J.S.A.* 9:6–8.10a(a). The Legislature's desire to protect abused and neglected children is firmly established. "[N]othing may be disclosed which would likely endanger the life, safety, or physical or emotional well-being of a child or the life or safety of any other person or which may

compromise the integrity of a department investigation or a civil or criminal investigation or judicial proceeding." *Ibid.*

■■■ Two oft-cited justifications for securing this level of confidentiality are provided. First, the statute is designed as a "procedural safeguard to protect victim children from unnecessary disclosure ... which may cause the child further guilt, vulnerability or humiliation." *J.C., supra,* 399 *N.J.Super.* at 447, 944 *A.*2d 745. "DYFS child abuse files often contain very sensitive information, including psychologist evaluations and diagnoses. Many individuals performing the evaluations [and] treatments ... are acting with the knowledge that their treatments or evaluations will be used for risk assessment and for therapeutic purposes only." *Id.* at 449–50, 944 *A.*2d 745.

Second, there is a need to protect those who come forward to report child abuse and neglect, which are often difficult to detect. *J.B., supra,* 120 *N.J.* at 125–26, 576 *A.*2d 261; *see also Division of Youth & Family Servs. v. T.H.,* 386 *N.J.Super.* 271, 276, 900 *A.*2d 335 (Ch.Div.2006); *Kaszerman v. Manshel,* 176 *N.J.Super.* 132, 135, 422 *A.*2d 449 (App.Div.1980). In fact, the statute grants immunity to persons who make such reports in good faith. *N.J.S.A.* 9:6–8.13.

As of 2008, Congress and all fifty state legislatures had adopted statutes preserving the confidentiality of records relating to children under the protective care or custody of the state. 42 *U.S.C.A.* § 5106a; 45 *C.F.R.* § 1340.20 (federal regulation deeming confidential those treatment records in child abuse cases to protect identity of reporters). As required by the Child Abuse Prevention and Treatment Act, states must create standard reporting procedures for abuse and neglect allegations, provide immunity for reporting abuse, and develop a methodology for preserving the confidentiality of the records, in order to receive federal grants. 42 *U.S.C.A.* § 5106a(b)(2)(A)(i), (vii), (viii). *See also* Howard Davidson, *Federal Law And State Intervention When Parents Fail: Has National Guidance For Our Child*

*Welfare System Been Successful?*, 42 Fam. L.Q. 481, 486 (Fall 2008).

New Jersey's statute delineates those statutorily authorized purposes for which records may be released "upon written request," *N.J.S.A.* 9:6–8.10a(b), many of which have been enumerated in our opinions. *See In re East Park High School*, 314 *N.J.Super.* 149, 156–59, 714 *A.*2d 339 (App.Div.1998); *Division of Youth & Family Servs. v. M.R.*, 314 *N.J.Super.* 390, 399–402, 715 *A.*2d 308 (App.Div.1998). Among these are use by police in investigations of alleged child abuse, physicians who suspect abuse, courts or grand juries, and anyone statutorily mandated to consider child abuse or neglect information when conducting a background check or employment-related screening regarding employment with an agency providing services to children. *N.J.S.A.* 9:6–8.10a(b)(1)–(23). *See also N.J.S.A.* 30:5B–25.3. Relevant to this matter, *N.J.S.A.* 9:6–8.10a(b) allows the release of records to:

> a parent, guardian ... or other person who is responsible for the child's welfare, or ... when the information is needed in connection with the provision of care, treatment, assessment, evaluation or supervision to such child[;]
>
> ....
>
> The legal counsel of a child, parent or guardian, whether court-appointed or retained, when information is needed to discuss the case with the department in order to make decisions relating to or concerning the child[;]
>
> ...
>
> A parent ... or legal guardian when the information is needed in a department matter in which that parent ... or legal guardian is directly involved. The information may be released only to the extent necessary for the requesting parent ... or legal guardian to discuss services or the basis for the department's involvement or to develop, discuss, or implement a case plan for the child[.] [*N.J.S.A.* 9:6–8.10a(b)(5), (17) and (19) ].

In addition, disclosure is authorized to any court "upon its finding that access to such records may be necessary for determination of an issue before it[.]" *N.J.S.A.* 9:6–8.10a(b)(6). Further releases by that court to a party may be made if the party demonstrates "disclosure is necessary for determination of an issue before the court[.]" *Ibid.* Therefore, the mechanism employed by our Legislature to preserve the confidentiality of DYFS records and protect a victim's privacy interests is to require

judicial review of a party's written request of the need for disclosure. *See Z.W., supra,* 408 *N.J.Super.* at 539, 975 *A.2d* 938 (stating a court must undertake an *in camera* review to discern whether DYFS records are necessary to determine an issue before it prior to a release to third parties not identified in the statute).

Through the provision of *Rule* 5:12–3, the parties in a Title Nine matter are afforded access to "relevant reports of [DYFS] and other reports of experts or other documents upon which the Division intends to rely," and counsel is permitted review of the Division's file. All other discovery requests "shall be permitted only by leave of court for good cause shown." *Ibid.*

We are mindful that the Division's release of information typically triggers the State's commencement of its criminal investigation.

> Title Nine contemplates criminal prosecution of acts of abuse and neglect that constitute crimes. *N.J.S.A.* 9:6–8.36a specifically requires that DYFS "immediately report all instances of suspected child abuse and neglect ... to the county prosecutor." Likewise, once the Division files a child abuse complaint with the Family Part, the court must immediately send a copy of the complaint to the county prosecutor. *N.J.S.A.* 9:6–8.25a.
>
> [*P.Z., supra,* 152 *N.J.* at 98, 703 *A.2d* 901.]

However, at that point the two investigations of the same incident have divergent objectives: DYFS seeks to secure the health, safety, and best interests of the child; the State's interest is in furtherance of a criminal prosecution.

Our case law has long upheld the release of records where necessary for a criminal defense. In *T.H., supra,* the Family Part released DYFS files to a criminal trial judge "for the purpose of an in-camera review to determine if any of the documents should be disclosed to the parties" in the criminal matter. 386 *N.J.Super.* at 281, 900 *A.2d* 335. However, where "the information was available elsewhere and [ ], regardless of its availability through other sources, the information was not determinative of any issues before the court or necessary for the conduct of the proceedings[,]" such requests were denied. *State v. Cusick,* 219 *N.J.Super.* 452, 463, 530 *A.2d* 806 (App.Div.), *certif. denied,* 109 *N.J.* 54,

532 *A*.2d 1118 (1987); *see also Kaszerman, supra,* 176 *N.J.Super.* at 134–35, 422 *A*.2d 449 (denying release of DYFS records to a parent contemplating the filing of a lawsuit when there is no "issue before the court" for which access to the records is necessary).

Surprisingly, neither the Supreme Court nor this court has had occasion to squarely address whether a disqualifying conflict occurs when one attorney assumes the tandem roles of counsel for the same defendant in both a Title Nine action and criminal proceedings arising from the abuse or neglect of a child. Two trial court opinions have examined the issue, reaching opposite conclusions. *See Division of Youth & Family Servs. v. J.C.,* 399 *N.J.Super.* 444, 446, 944 *A*.2d 745 (Ch.Div.2006) (concluding, as a matter of public policy, there is a valid reason to enjoin a selected attorney from representing defendant in both matters); *Division of Youth & Family Servs. v. V.J.,* 386 *N.J.Super.* 71, 82, 898 *A*.2d 1059 (Ch.Div.2006) (rejecting the contention that an attorney's representation of the defendants in both the civil and criminal matters impairs the confidentiality of records or statutory privileges).

Although our review of Title Nine, federal legislation, and these authorities, counsels against unfettered access to the Division's file outside the parameters of the Title Nine litigation, even for purposes of criminal defense, *see contra V.J., supra,* 386 *N.J.Super.* at 82, 898 *A*.2d 1059, we cannot agree with the wholesale rejection of all such requests based upon the policy considerations put forth in *J.C., supra,* 399 *N.J.Super.* at 446, 944 *A*.2d 745.

The Division's records must be subjected to the court's review to determine the necessity of access outside the context of the Title Nine litigation. *See Z.W., supra,* 408 *N.J.Super.* at 539, 975 *A*.2d 938. These issues include whether counsel might obtain information to which he or she otherwise would not be privy, and whether the release of information conflicts with the State's goals of maintaining the confidentiality of reporters of abuse and neglect, and of treatment records and reports regarding the victim

child. *Ibid.* (citing *Ritchie, supra,* 480 *U.S.* at 59–61, 107 *S.Ct.* at 1002–03, 94 *L.Ed.*2d at 58–60).

 We conclude these concerns should be addressed by the court in reviewing dual representation requests that might otherwise defeat the statutory confidentiality requirements. For example, after balancing the competing concerns posed, the court may allow dual representation subject to a protective order, which preserves the confidentiality of the source prompting the Division's protective services litigation. In this way, the State's interest in eliminating any chilling effect on disclosure of abuse and neglect is protected by assuring the anonymity of those individuals and agencies who report abuse. So too, necessary orders would be entered when the need to safeguard a child victim and preserve the confidentiality of the victim-child's records is more compelling than the parent's right to employ a desired choice of legal representative. *See Cusick, supra,* 219 *N.J.Super.* at 462, 530 *A.*2d 806. Additionally, a prohibition on providing photocopies of various records to parent-defendants could be effectuated. Finally, any authorization of criminal counsel to undertake representation in the Title Nine litigation would be subject to the strictures of *N.J.S.A.* 9:6–8.10a(a). Thus, there is no presumption that the Division's records are permitted to be used in the parallel criminal matter. In fact, that conduct is specifically precluded until and unless the court determines the information is relevant and "necessary for determination of an issue before the [criminal] court." *N.J.S.A.* 9:6–8.10a(b)(6).

We believe these procedures safeguard the goals of the State to uncover and treat abuse and neglect, and to protect victim children, without unnecessarily sacrificing a parent's right to exercise a desired choice of legal counsel. We believe the Family Court, acting in its role as *parens patriae,* will best balance these competing concerns, making its determinations on a case-by-case basis.

 Counsel who desire to provide dual representation to a Title Nine litigant, who is also a criminal defendant, have an

affirmative obligation to disclose this fact to the court and other counsel. All parties, including the Division and the Law Guardian, must be afforded notice and an opportunity to review the request and address any perceived conflicts or any other overriding confidentiality concerns to be considered by the court in its review.

In this matter, we reject N.S.'s proposition that the denial of Lawrence's services warrants reversal of the abuse and neglect finding. Lawrence first requested substitution after trial had commenced. He appeared without notice or consent from N.S.'s counsel, who would be required to withdraw; without notice to all other counsel; without serving the Division and the Law Guardian with his motion; and without including a statement that the late substitution would not delay the proceedings. *R.* 1:11–2(a)(2). Likewise, in light of the lack of notice, the court's denial of the request to sit "second chair," was not an abuse of discretion. Thereafter, when Lawrence formally presented his request, the court had already reached its finding of abuse and neglect.

N.S. posits no challenge to the result of the dispositional determinations regarding J.B. and K.B.; her arguments contest only placement of K.A.N. with his father. In our opinion, we have addressed and dispelled those assertions of error. Thus, even if Lawrence's representation was granted, as requested on June 9, 2005, the result would be unchanged. Therefore, to the extent the court erred, it was harmless. *R.* 2:10–2.

Lastly, we consider R.B.'s claims he was denied effective assistance of counsel. *R.* 5:12–7. We disagree.

First, R.B. states his assigned attorney discovered he had provided legal representation to J.N. in a different proceeding and therefore had a conflict of interest that created an appearance of impropriety. *RPC* 1.7. On March 22, 2006, the issue was presented to the court; however, the court did not address the issue due to the limited appearances that day. R.B.'s former attorney later acknowledged the prior representation occurred in 1994, and he "had no recollection of representing J.N."

An appearance of impropriety warranting a mistrial must be " 'something more than a fanciful possibility' " and " 'must have some reasonable basis.' " *State v. Loyal,* 164 *N.J.* 418, 429, 753 *A.*2d 1073 (2000) (quoting *In re Opinion No. 653,* 132 *N.J.* 124, 132, 623 *A.*2d 241 (1993)). However, it still " 'may be sufficient to present an ethical problem even though no actual impropriety exists.' " *Ibid.* (quoting *Higgins v. Advisory Comm. on Prof'l Ethics,* 73 *N.J.* 123, 129, 373 *A.*2d 372 (1977)).

R.B. offers no basis to support an actual conflict of interest or even the appearance of impropriety, except to suggest he was J.N.'s adversary in determining custody of K.A.N. We disagree and find no substantial risk of disservice to R.B. in counsel's prior criminal representation of J.N. more than ten years prior to the transfer of K.A.N.'s custody. *Dewey v. R.J. Reynolds Tobacco Co.,* 109 *N.J.* 201, 216, 536 *A.*2d 243 (1988).

 Relying on *Division of Youth & Family Servs. v. B.R.,* 192 *N.J.* 301, 306–09, 929 *A.*2d 1034 (2007), R.B. next contends counsel assigned to represent him at trial fell below the level of professionally acceptable behavior and prejudiced his defense. Arguing counsel was "asleep at the wheel" and "deficient in every respect," R.B. seeks reversal of the finding of abuse and neglect. More specifically, R.B. argues counsel did not object to K.A.N.'s statement as related by Dr. Hodgson, request the transcript of the police statement, or interview his nephews who were in the home prior to K.S.N. becoming ill. Additionally, R.B. cites the failure to present expert testimony to rebut Dr. Hodgson's conclusions as "undeniably deficient."

"[T]he performance of [ ] counsel must be effective." *B.R., supra,* 192 *N.J.* at 306, 929 *A.*2d 1034. In *B.R.,* a termination of parental rights case, the Court held that allegations of ineffective assistance of counsel must be tested against the two-part test first announced in *Strickland.*[9] *Id.* at 307–09, 929 *A.*2d 1034. We

---

[9] *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984).

cannot find counsel's performance objectively deficient, that is, falling outside the broad range of professionally acceptable performance. Additionally, we cannot find that any alleged deficient conduct prejudiced R.B. such that the result of the proceeding would have been different. *Ibid.* A jury convicted R.B. of reckless manslaughter, finding, beyond a reasonable doubt, that his conduct caused K.S.N.'s death. This conviction dispels R.B.'s alleged satisfaction of the second prong of the *Strickland* test. *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698; *accord State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987) (adopting the *Strickland* standard in New Jersey).

We have already found no flaw in the trial court's use of K.A.N.'s police statement and Dr. Hodgson's testimony. R.B.'s contention of ineffective assistance due to the failure to call witnesses, such as his nephews, is unsupported as he fails to provide certifications from the witnesses relating the substance of the omitted testimony, along with arguments regarding relevance. *B.R., supra,* 192 *N.J.* at 311, 929 *A.*2d 1034. The videotape of K.A.N.'s statement was not released by the prosecutor, despite the Division's requests. As to the absence of a defense expert, R.B. later employed Gary Stein, M.D. However, this did not aid his position, and Dr. Stein was not offered as a witness. The copy of Dr. Stein's purported testimony provided in the record is redacted, rendering it useless. We conclude the arguments advanced are without merit.

The remaining contentions presented in support of an ineffective assistance of counsel claim are quickly dispelled. The controversy surrounding the wholesale release of R.B.'s file to counsel, who was "contemplating" the filing of an appeal, was properly presented to the court. R.B.'s attorney relied on the PRU guidelines and prior court rulings regarding the confidentiality of the materials. The court determined appropriate file access to potential appellate counsel.

R.B.'s claims of prejudice because N.S.'s counsel "infected the proceedings" when he sought entry of a finding of abuse and

neglect after Jankowski testified, effectively limiting the presentation of additional evidence. R.B.'s counsel immediately disagreed, deflating the claim on appeal that this was "the equivalent of a stipulation of guilt on the part of the defendants." The motion had no impact on R.B.'s case or the resultant determination.

## VI.

In summary, we affirm the trial court's findings of abuse and neglect, concluding the determinations are adequately supported by substantial credible evidence in the record. We find no flaw in the court's evidentiary determinations or its conclusion that the Division sufficiently proved aggravating circumstances, relieving it of its obligation to provide reasonable efforts for reunification. We do not disturb the court's determination of the various issues involving defendants' representation. Finally, we conclude no ineffective of assistance of counsel has been shown. Accordingly, the orders of the trial court finding N.S. and R.B. committed acts of abuse and neglect and granting custody of K.A.N. to J.N. are affirmed.

Affirmed.