**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1365-15T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

D.T.,[1]

    Defendant-Appellant,

and

C.M. and S.C.,

    Defendants.

_____

IN THE MATTER OF L.C., N.T.,
and A.T.,

    Minors.

_____

        Submitted April 26, 2017 — Decided September 11, 2017

        Before Judges Fuentes and Gooden Brown.

        On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FN-04-574-14.

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials and pseudonyms to protect the confidentiality of the parties in these proceedings.

Joseph E. Krakora, Public Defender, attorney for appellant (Kimmo Z. H. Abbasi, Designated Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Laura A. Dwyer, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Margo E.K. Hirsch, Designated counsel, on the brief).

PER CURIAM

Defendant D.T. is the biological father of ten-year-old A.T. (Albert), and eight-year-old N.T., (Nancy). Defendant is also the "guardian"[2] of fifteen-year-old L.C. (Linda), a girl defendant raised since she was two years old. At all times relevant to this case, defendant and the children resided with C.M. (Carin), who is the biological mother of all three children. Defendant appeals from the October 1, 2014 order entered by Judge Francine I. Axelrad finding he abused and neglected these children under N.J.S.A. 9:6-8.21c(4)(a). Defendant also appeals from the October 19, 2015 order entered by Judge Donald J. Stein terminating the Title 9 litigation because a complaint to terminate defendant's parental rights under Title 30 had been filed. We affirm.

---

[2] Under N.J.S.A. 9:6-8.21a, the Legislature defined "guardian" to include the "paramour of a parent, or any person, who has assumed responsibility for the care, custody, or control of a child[.]"

A-1365-15T3

At approximately 1:35 a.m. on March 30, 2014, the Division of Child Protection and Permanency (Division) received a referral of child abuse concerning these three children from Investigator Dillon Deacon of the Camden County Prosecutor's Office. According to the report filed by Division caseworker Jillian Mulhern, Carin, the children's mother, "showed up to the Chesilhurst Police Department, by banging on the windows, with no shoes on and possibly intoxicated." Carin reported to the police that she was "not comfortable living in her home with her boyfriend" and feared he would call the police to make allegations against her.

Division caseworker Mulhern was also told that Carin claimed defendant "was holding her against her will and forcing her to prostitute." Mulhern thereafter confirmed that defendant had in fact called the Chesilhurst Police Department "and alleged that [Carin] sexually assaulted her daughters a few weeks ago." Investigator Deacon told caseworker Mulhern that he had interviewed the oldest daughter Linda, who was then eleven years old, in the police station. Linda "disclosed that her mom touched her breasts and private part between her legs however could not give any time frames." Deacon also told Mulhern that Linda "seemed delayed or perhaps uneducated."

Although defendant was the first adult in the family to call law enforcement, he was not cooperating and had "fled" with his two "biological kids."  Mulhern and fellow Division caseworker Tracie Simpson continued to investigate this chaotic and highly fluid situation.  They eventually were able to interview Linda. The caseworkers wrote that the child "appeared dirty; her clothes looked dirty and worn with stains on them.  [She] smelled badly and her hair was not done and matted."  Linda told the caseworkers that she lived with her mother, defendant and her two younger siblings.  Linda said her mother had "meetings" with men who would come to her house.  She did not know these men; she and her siblings were told to stay in their room when these men would come to the house.

The Division caseworkers also spoke with Nancy, who was then four years old.  This child's clothes were also dirty and exhibited signs of poor personal hygiene.  Nancy told the caseworkers the police officers had brought her to the station because "her mom ran out of the house."  She did not know why her "mommy runned [sic] out of the house."  Nancy claimed that both her parents "pluck us like this real hard and beat me with an extension cord." She also said her mother "touched her 'here' and pointed between her legs."  The caseworkers noted that Nancy "appears behind for her age with speech development and cognitive abilities."

A-1365-15T3

The caseworkers also interviewed Albert at the Chesilhurst Police Station. The boy was then six years old; his hair was "matted" and he was "very dirty and his clothes were also dirty." He was wearing sneakers without socks and "smelled very badly." He said he was brought to the police station because his mother "ran out." He did not know why. Albert did not know his birthdate and could not spell his name. He did not go to school. According to the caseworker, when she asked him about "meetings in the house," he said: "I gotta [sic] meditate to help me think." The child then "closed his eyes, crossed his legs and raised his hands up as though to meditate. He then spoke with workers and said his dad does not work and that's why they have meetings because they pay him." He did not know the people who came to these "meetings." He also said defendant told him not to tell anyone about the meetings "because he doesn't want anybody to know their business."

The caseworkers also interviewed the children's mother, Carin, who was then thirty-one years old. When asked about defendant, Carin told them "basically, he's been prostituting me." Carin also claimed defendant was physically abusive in his discipline of her oldest child, Linda, because she was not his biological daughter. Carin told the caseworkers that the sex originally started "as sex with females and then it got into gay acts with [defendant] joining in. [I]t didn't start with the paid

5                                      A-1365-15T3

part but then [defendant] put this on Craig's list for people to pay her." She alleged defendant would beat her and lock her up in her room to force her "to participate all the time." According to Carin, this has been going on since 2007.

When asked about the children, Carin claimed defendant did not allow the children to attend school. She had Linda "in an on-line school but she hasn't been doing it." They live in an abandoned house. Defendant "smokes a lot of weed" and drinks a "lot of alcohol." When the caseworker asked Carin what caused her to seek help from the police this day, she said she seized the opportunity to flee when defendant left the door open while he was engaged in a sexual act with a man who had responded to Craig's list. She took Linda because she knew defendant would not hurt his own biological children. Carin also claimed that defendant told her that if she ever left, he would kill her.

At some point in the early morning hours of March 30, 2014, defendant called the Chesilhurst Police Department. The Division reports note that "Officer Seymour attempted to get him to come into the Police Department." Officer Seymour claimed defendant "wanted the cops to know he can read minds and he will know what they are thinking." Defendant did not agree to voluntarily come to the police station. After consulting with her Supervisor, the

6                                                      A-1365-15T3

caseworkers decided to execute an emergency DODD removal[3] of the children. Division records indicate that Carin was arrested and charged with two counts of second degree sexual assault, N.J.S.A. 2C:14-2(b), and two counts of second degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2).

Carin was interrogated by investigators from the Camden County Prosecutor's Office. The appellate record includes a copy of this investigation report. Carin told the investigators that she lived with defendant and the children in an abandoned building that did not have running water, heat, or a functioning toilet. A person using the toilet was expected to fill a bucket with water from a well in the basement, carry the bucket filled with water to the bathroom, and pour the water into the toilet. They used a space heater to warm the water to wash. Because the water was not suitable for drinking, they filled bottles with water they took from defendant's mother's house.

---

[3] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." See N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011) (quoting N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010)).

Law enforcement investigators executed a search warrant of the abandoned building where defendant, Carin, and the children resided. The report of the search corroborated Carin's description of her living conditions. The dwelling was dirty, had a bad smell, did not have running water, and the floor was littered with trash. The toilet did not have water in the tank; the refrigerator had rotting food.[4] The investigators also retrieved two postings under the "Personal Encounters section" of Craigslist.com, with the entry dates March 6, 2014 and March 29, 2014. These postings contained explicit language describing sexual acts and requesting those interested to send photographs and other information.

The prosecutor's investigators also interrogated defendant. He told them he had had a "guest" in the home that evening who brought $100 to buy alcoholic beverages. Defendant also admitted to having posted the Craigslist sexual encounter postings, but claimed no one responded. Defendant also admitted that the children were home when the people responding to the Craigslist postings came to the house. Defendant claimed the children were told to stay in their room. Defendant admitted to Division caseworker Nicole Curtis that he and Carin were "swingers" who looked for like-minded people on Craigslist. He also admitted to

---

[4] The appellate record includes numerous photographs depicting the dilapidated conditions these three children were forced to endure.

using marijuana and ecstasy. With respect to the children, defendant admitted they were not going to school, but claimed he was not against them attending school.

The Division arranged for the children to be physically evaluated by Dr. Martin Finkle of Rowan University CARES Institute.[5] The older child, Linda, reported being hit with a belt "a lot" by both Carin and defendant. Albert "had a number of linear marks on his back and buttocks that could easily be the result of the use of an object, such as a belt or a cord[.]" Nancy also reported being hit with a belt and cord and to seeing her parents engaged in physical fighting. With respect to their cognitive and emotional development, Linda was found to have verbal and nonverbal scores that fell significantly below her age level. She reported having suicidal thoughts and symptoms consistent with post-traumatic stress disorder. Albert was enrolled in kindergarten. His verbal and nonverbal skills were extremely low. Nancy had speech difficulties and was recommended for a child team evaluation.

---

[5] "The CARES Institute provides an array of medical and mental health services developed to meet the diagnostic and therapeutic needs of children through an individualized plan for the specific circumstances of each child and family." See http://www.caresinstitute.org (Last visited on August 29, 2017.)

Judge Axelrad conducted a fact-finding hearing over three non-sequential days on August 12, 2014, September 29, 2014, and October 1, 2014. The Division presented the testimony of Detective Deacon, and caseworkers Mulhern and Curtis. These witnesses described the events that led to the Division's involvement and described the children's living conditions and the concomitant harm they suffered as a result. Defendant called his mother and testified on his own behalf. Their testimony corroborated the accounts of defendant's behavior revealed in the course of the Division's investigation. On September 28, 2014, Carin entered into a stipulation admitting that she abused and neglected her children by failing to send them to school for seven months.

In her oral opinion delivered from the bench on October 1, 2014, Judge Axelrad found the testimony of the witnesses called by the Division credible. Conversely, she found defendant's testimony was not credible. Judge Axelrad found defendant shifted the blame to Carin and absolved himself of all responsibility for the squalor and depravity that surrounded these children. In Judge Axelrad's words: "Basically what happens is he doesn't take responsibility for things when he knows it's not in his best interest to take responsibility."

Judge Axelrad found the Division proved, by a preponderance of the credible evidence, that defendant educationally abused

Linda and Albert by keeping them out of school from September 2013 through March 30, 2014. Defendant's actions constituted "reckless disregard of their welfare" pursuant to N.J.S.A. 9:6-21(c)(4)(a). Judge Axelrad also found the Division proved, by a preponderance of the credible evidence, that defendant abused and neglected these three children by failing to provide them with food, clothing, and shelter, despite being financially able to do so. Ibid.

The judge also found the Division established "by clear and convincing evidence" that defendant provided inadequate supervision and placed the children in substantial risk of harm "by advertising on Craigslist and inviting strangers to the house for the purposes of sex and drugs with the children on the property in the . . . adjoining room." The judge found "completely incredible the statement by [defendant] that the only time that the children were there was the time he got caught, which was the weekend of his birthday[.]" Applying the standard established by the Court in G.S. v. Department of Youth and Family Services, 157 N.J. 161, 178 (1999), Judge Axelrad found defendant failed to exercise a minimum degree of care, despite being aware of the dangers inherent in the situation. The judge concluded the children were not harmed by these strangers only because they were

11

"smart enough to stay in the room, and keep the door closed, and if necessary barricade the door."

We are bound to uphold the factual findings of the Family Part predicated on the credibility of a witness' testimony because the judge "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." Division of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008). "We also recognize the special expertise of those judges assigned to the Family Part." New Jersey Div. of Youth & Family Services v. N.S., 412 N.J. Super. 593, 616 (App. Div. 2010), (citing Cesare v. Cesare, 154 N.J. 394, 412-13 (1998)).

Guided by these standards, we discern no legal basis to interfere with Judge Axelrad's factual findings and ultimate determination finding defendant abused and neglected these children under N.J.S.A. 9:6-21(c)(4)(a). The record is replete with evidence establishing that defendant abused and neglected these children in almost every way imaginable. He failed to provide them with the most rudimentary aspects of living, food, shelter and deprived them of an emotionally nurturing environment.

The academic neglect of the two older children may prove to be the most irreparable of all the harms defendant inflicted on these children. The early childhood years constitute a critical,

12

yet fleeing opportunity for a child to develop a healthy emotional persona and lead an intellectually stimulating life. The evidence presented by the Division shows these children are developmentally delayed and have yet to acquire the cognitive skills commensurate to their age group. Defendant's attempt to absolve himself of responsibility for causing this harm also supports Judge Stein's decision to terminate the Title 9 litigation to allow the Division to move forward with its action to terminate defendant's parental rights under Title 30.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION