# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3697-18T2
            A-3698-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.A.C. and R.G.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
I.L.G., A.M.G. & R.G., JR.,

     Minors.

_____

        Submitted June 1, 2020 – Decided July 6, 2020

        Before Judges Rothstadt, Moynihan, and Mitterhoff.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0117-19.

Joseph E. Krakora, Public Defender, attorney for appellant K.A.C. (Robyn A. Veasey, Deputy Public Defender, of counsel; Ilea Anne Kozak, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant R.G. (Robyn A. Veasey, Deputy Public Defender, of counsel; Bruce Pozu Lee, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the briefs).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors A.M.G. and R.G., Jr. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; James Dey Harris, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor I.L.G. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Rachel E. Seidman, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendants K.A.C. (Kim) and R.G. (Rick) appeal from an April 12, 2019 guardianship judgment that terminated their parental rights to their three special needs children: A daughter, I.L.G. (Iris), born in 2014; another daughter, A.M.G. (Anna), born in 2016; and a son, R.G.,

Jr. (Ricky), born in 2018.[1] On appeal, defendants argue that plaintiff, the Division of Child Protection and Permanency (Division) failed to prove the four prongs of the best interest of the child test as set forth in N.J.S.A. 30:4C-15.1(a). In addition, Rick argues that the trial judge impermissibly considered evidence of an alleged threat he made against another judge and that he received ineffective assistance of counsel (IAC). We find no merit to these arguments and affirm, substantially for the reasons expressed by Judge Francine I. Axelrad in her comprehensive oral decision placed on the record on the date she entered the challenged judgment.

The Division's involvement with Kim began in 2010 and related to Kim's older children from a prior relationship. Due to Kim's substance abuse issues, those children were removed from Kim's care after she overdosed on heroin while alone with her young children. Those children were eventually placed in the care of their deceased father's mother under a Kinship Legal Guardianship.[2]

In this action, Iris and Ricky were removed from defendants when Kim and the two children tested positive for narcotics at their respective births and

---

[1] We use initials and fictitious names to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d).
[2] See N.J.S.A. 3B:12A-1 to -7.

the children experienced withdrawal symptoms. Anna was removed from her parents when Kim attended a drug treatment program with Anna while under the influence. In all three situations, Rick refused to acknowledge that Anna was abusing her medications and other drugs. Rick maintained then, as he did throughout this litigation, that Kim was capable of caring for their children. Both parents refused to acknowledge that any of their children suffered from diagnosed issues or required any treatment.[3]

When Iris was born, she and Kim tested positive for opiates. Iris remained in the hospital for twenty-two days and was diagnosed with neonatal abstinence syndrome. The Division was alerted, and during its ensuing investigation, Kim told caseworkers that while she was pregnant she had taken oxycodone from an old prescription that had been prescribed for her back pain.

When Rick was advised that Iris needed treatment for withdrawal symptoms, Rick "didn't agree with the doctor's diagnosis," and he wanted to remove Iris "from the hospital against medical advice." After medication was given to Iris to counteract the withdrawal symptoms, Rick reacted with

---

[3] Iris was diagnosed with Autism Spectrum Disorder and sensory processing difficulties. Anna has developmental delays and Ricky qualified for early intervention services.

A-3697-18T2

aggression towards hospital personnel, causing him to be ejected from the hospital. Kim and Rick denied that Kim abused narcotics, Rick maintained Kim could care for her child, they were uncooperative in the Division's investigation, and aggressive towards its representatives.

The Division conducted a Dodd removal[4] in December 2014 and placed Iris in a non-relative resource home. Although a Family Part judge approved the removal, the judge later granted Rick physical custody of Iris, and instructed the Division to maintain Iris's care and supervision. The judge granted Kim supervised visits with Iris, with Rick not being allowed to supervise.

On March 20, 2015, a judge held a fact-finding hearing, where he concluded that Kim abused and neglected Iris by causing her to suffer withdrawal symptoms at birth for which Iris was treated in the intensive care unit of the hospital for twenty-two days. At the end of the hearing, the judge granted, under an FD Docket, the continuation of supervised visits for Kim,

---

[4] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

sole legal and physical custody to Rick, and terminated the FN litigation. Afterwards, Rick and Iris temporarily moved to Puerto Rico in 2015. Kim followed a few months later.

Anna was born in 2016 while the family continued to reside in Puerto Rico. The Division could not determine whether Anna also tested positive for drugs or suffered any withdrawals, but Rick denied that she did.

At the end of December 2016, the family moved back to New Jersey. At that time, Rick and Iris lived with Rick's cousin, A.G., while Kim and Anna lived with Rick's sister, D.G. When Rick was at work, Iris stayed with Kim, Anna, and D.G. Kim and Rick maintained this arrangement until August 18, 2017.

On August 18, 2017, the Division received a referral that Kim was under the influence of drugs while she was solely responsible for the care of Anna. The referral came from a program provider who observed Kim passing out and unable to communicate while she had her child with her.[5]

Once again, Kim denied drug use, but admitted to using prescribed medication for her anxiety and bipolar disorder. She refused to undergo any

---

[5] Kim had to complete the program in order to be eligible for public assistance.

drug screenings or sign a release which would allow the Division to access her medical records. According to the caseworker, it was apparent that Kim was abusing her medication because the caseworker observed that the prescription, which was for sixty pills to be taken twice daily, had been filled only four days earlier yet only one-half of the sixty pills were left in the bottle. Rick again repeatedly denied to the Division that Kim had a drug problem and accused its representatives of lying. He maintained that Kim could care for the children.

In addition to Kim's substance abuse issues, the family was homeless. Kim informed the caseworker that she was homeless because she failed to complete programs that were required for her to receive any public assistance. Additionally, D.G. told the Division that the family lacked a permanent home and while Rick was living at multiple locations, D.G. allowed Kim, Iris, and Anna to stay with her.

On August 18, 2017, the Division conducted a Dodd removal of Iris and Anna. A Family Part judge approved the removal based upon Kim's drug abuse and, also, Kim's and Rick's lack of stable housing. Both children were placed in a non-relative resource home, where they remained through the guardianship trial.

A-3697-18T2

After Iris and Anna were removed, the Division arranged for defendants to visit their children. However, Kim was not permitted to attend visitation with Rick, and she initially failed to schedule a visit with the children despite the Division's numerous attempts to contact Kim. Once a visit was scheduled, Kim failed to attend.

The Division also conducted a family team meeting. Kim did not attend the meeting. At the meeting, Rick denied that Kim had a substance abuse problem and believed that the Division was lying about the situation. Approximately two weeks later, on September 5, 2017, at a parent-child visit, Kim refused to sign a document that outlined the steps she needed to take to be reunified with her children and declined to submit to a hair follicle test. She was also advised to submit to a random drug screening that day. Kim tested positive for opiates and methadone.

Thereafter, a judge ordered both Kim and Rick to undergo psychological evaluations and submit to random drug and alcohol screenings. Kim was further ordered to undergo a substance abuse evaluation. The Division offered them numerous services to address Kim's substance abuse, their mental health issues, and their housing issues. Defendants were uncooperative and belligerent in their resistance to what was being offered. At the time of the

8

removal, Iris was suffering from significant dental issues that had not been treated.

Later that month, Kim attempted to "reschedule" a random drug screening. Eventually she underwent an evaluation at Substance Abuse Initiative (SAI). There, Kim explained that she started abusing drugs at age sixteen. She admitted to using drugs again around the time that her two eldest children were removed, but stated that the drug use was due to pain "stemming from a car accident and pass[ing] out in the bathroom[, which caused her to] hit her head." The evaluator determined that Kim had both substance abuse and mental health disorders.

In addition to attending that evaluation, by October 2017, Kim had completed a psychological evaluation with Dr. Meryl E. Udell, a psychologist.[6] Dr. Udell found Kim minimized her substance abuse and recommended that she attend substance abuse treatment. Dr. Udell diagnosed Kim with opioid use disorder and anxiety disorder with panic attacks. The doctor made recommendations for numerous services, including: In-patient substance abuse treatment; individual therapy to learn coping skills, with a higher level of treatment than methadone maintenance including a Mentally Ill Chemical

---

[6] Dr. Udell did not testify at trial and her report was not entered into evidence.

Abuse (MICA) program to address her depression, anxiety, and substance abuse; and that Kim "sign releases to allow the Division to track her progress at any program she . . . enrolled [in] as she ha[d] a tendency" of being untruthful. The doctor also recommended that Kim submit to a hair follicle test and be subject to random urine drug screens "for one year after she complete[d substance abuse treatment] to monitor her for relapse."

Following her evaluations, a Division worker contacted an SAI worker, who informed the worker that Kim was attending Camden Treatment, where Kim was receiving methadone treatment and she was also enrolled in an intensive outpatient program. SAI recommended that Kim receive mental health treatment from Oaks Integrated and see a psychiatrist for a prescription for benzodiazepines instead of a family doctor. SAI also informed the Division that Kim was attending a prenatal program for mothers who were taking methadone.

However, on December 21, 2017, Kim was discharged from Camden Treatment because she threatened a staff member. On December 26, 2017, Kim failed to attend her intake appointment with a mobile methadone provider, Urban Treatment, and, instead, Kim returned to Camden Treatment only to threaten staff and spit at the receptionist. Ultimately, she was banned from

10

Camden Treatment for a two-year period. However, Kim began receiving therapy for her anxiety at Oaks Integrated on January 26, 2018, and by February 21, 2018, she had already attended three sessions.

On February 6, 2018, Kim was ordered to sign releases for Camden Treatment, Urban Treatment, and Oaks Integrated and to cooperate with her mental health treatment. That same day a Title 30 summary hearing was scheduled for April 16, 2018. Afterwards, Kim attended her SAI appointment, but failed to complete the assessment and refused to reschedule. As a result, SAI closed the case. The Division referred Kim for Services to Overcome Drug Abuse Among Teenagers (SODAT) for random drug screenings. She received a call on February 15, 2018, for an initial drug screening that had to take place within twenty-four hours. Instead, on February 20, 2018, Kim appeared at SODAT's office, seemed to be under the influence of drugs, and was turned away.

Earlier, on February 16, 2018, a judge held a fact-finding hearing and concluded that Kim had not abused or neglected Iris or Anna under Title 9. At the time, the Division had not sought an abuse and neglect finding against Rick. Iris and Anna remained in the Division's custody for care and

supervision under a Title 30 action.[7]

As to Rick, the Division provided him with a list of affordable housing options. If Rick provided the Division with evidence of stable housing, and the Division were to assess and approve the home, then Iris and Anna would be returned to him. Although the Division made referrals, Rick at times refused to participate in court ordered random drug screenings and never looked for appropriate housing. Moreover, while lashing out at a Division caseworker, Rick threatened to kill the judge who ordered the screenings.

Rick attended a psychological evaluation conducted by Dr. Carissa Ferguson-Thomas.[8] During the evaluation, Rick explained the issues he had with controlling his anger. Rick denied that Kim had a drug problem and did not plan to cease the relationship with Kim. He further denied minimizing Kim's substance abuse issues but insisted that the Division's allegations were

---

[7] While we were not provided with the complaint from the FN litigation, we assume that at the conclusion of the Title 9 action, the court converted the matter to a Title 30 action. See N.J. Div. of Youth & Family Servs v. T.S., 426 N.J. Super. 54, 66 (App. Div. 2012) ("[W]here the Division initially proceeded under Title 9 and Title 30, the dismissal of the Title 9 action due to a finding of no abuse or neglect requires a hearing as to whether an order of care and supervision should be entered under Title 30.").

[8] Dr. Ferguson-Thomas did not testify at trial, but her reports were entered into evidence.

baseless. Dr. Ferguson-Thomas recommended that since Rick planned on parenting with Kim and living with her, he should "participate in a support group for family members of addicts."

In March 2018, when Kim gave birth to Ricky, they both tested positive for methadone and Xanax. Ricky was admitted to the neonatal intensive care unit and was later transferred to a different facility to address his withdrawal symptoms. The Division conducted an emergency removal of Ricky after Kim refused to sign a release to verify with her doctor that she had a prescription for Xanax. Ricky was placed in the same non-relative resource home as Iris and Anna, where he remained throughout the guardianship trial. In April 2018, a judge approved the emergency removal and granted the Division custody of Ricky.

On April 10, 2018, Kim was discharged from her outpatient treatment program at Oaks Integrated because she was still addicted to drugs, which made outpatient services ineffective.[9] Thereafter, Kim requested that Oaks Integrated not provide the Division with any information regarding her medical records.

---

[9] Throughout the litigation, when Kim participated in a drug screening, she always tested positive for Xanax and methadone, both of which she had been legally prescribed, and never for heroin.

Later in April 2018, the court ordered that Rick attend an alcohol education program because of a positive drug test revealing alcohol usage. Kim also signed a release for Oaks Integrated but restricted the release to "sessions [plus] how many [she] went to." In May 2018, Kim refused to submit to a drug screening at SODAT. Later that same month, Kim told the doctor who had been prescribing her Xanax that she was also taking methadone. He warned her of the dangers of taking both drugs simultaneously, informed her not to take Xanax with methadone, and requested she participate in a psychiatric assessment. The Division was able to obtain this information in July 2018 as Kim signed a release in relation to her medical care from her primary care physician but restricted the release to information pertaining to the dosage of her prescribed medication and attendance. The month prior, Kim also signed a release for Urban treatment but restricted the release to information pertaining to her counselor, her attendance, case notes, and drug screenings.

Throughout the ensuing months, although their interaction with their children was generally positive, defendants' visits with their children were often minimally disruptive and at times chaotic. At various times, arguments arose between Kim and the visitation providers or between Kim and Rick. On

14

two occasions, as a result of Kim's and Rick's unintentional conduct, Anna sustained injuries and had to be treated at a hospital's emergency room. When the Division later referred the family to a therapeutic visitation program at Oaks Integrated, during a family team meeting, Kim and Rick yelled at the program's employee and Rick asserted that he would not participate in the service. Furthermore, although a judge ordered Rick to participate in an outpatient program for alcohol, he did not comply.

When the Division attempted to contact Camden Treatment regarding Kim's treatment records on July 11, 2018, the program would not produce them without a subpoena as a signed release would not be enough. That same day, her counselor at Urban Treatment reported that Kim had attended the program four times per week for methadone treatment but was not receiving any mental health services there.

At a summary hearing held on August 9, 2018, the judge determined that Kim was unable to care for the three children and that the Division would retain care, supervision, and custody. The judge ordered Kim to attend a MICA program, Rick to attend anger management, and both individuals to participate in a domestic violence assessment. By December 6, 2018, Rick never attended anger management.

A-3697-18T2

Visitation resumed through a therapeutic visitation program, but the provider ended services to the family because its facilitator felt unsafe due to Kim's and Rick's aggressive behavior during a visit. At that time, Kim and Rick acted aggressively towards a security guard who was scanning Kim with a metal detector wand. The security guard declined Kim and Rick entry into the building, which caused Kim and Rick to behave in a hostile manner. In an effort to provide the visitation, the facilitator offered to conduct the visit outside at a picnic table, but Kim and Rick refused and acted aggressively towards her, causing the facilitator to threaten to call the police. Ultimately, the facilitator declined to continue the visit based upon Kim's and Rick's behavior. At the end of the visit, Rick would not relinquish Anna. When the facilitator moved away from Kim and Rick at the request of the security guard, Kim followed her and started screaming at the facilitator, threatening to "bitch slap" her, and telling the facilitator that she "better watch out."

Therapeutic visits were not the only service terminated by a provider. On October 1, 2018, SAI closed Kim's case again due to her continued non-compliance.

On October 3, 2018, the Division filed its guardianship complaint. During an October 4, 2018 hearing, the Division reported that Kim was not

16

compliant with her services. Again, a judge ordered Kim to attend MICA, Rick to attend anger management, and both parties to attend a domestic violence assessment. Although a Division caseworker met with Kim and Rick to schedule a family team meeting, they later failed to attend.

A subsequent report from Kim's primary care physician, indicated that the doctor consulted a statewide database for prescribers that showed another doctor also wrote Xanax prescriptions for Kim. Although he had previously told Kim to see a psychiatrist, he was unsure if she had done so.

Subsequently, when visitation resumed at the Division offices, it improved for a short period before Kim and Rick once again behaved in a disruptive manner. Specifically, in November 2018, two incidents occurred when Kim and Rick arrived too late for their scheduled visit, which in one instance caused them to argue, and in both instances, they left the office without seeing their children. Subsequently, from December 2018 through February 2019, the family did enjoy several positive visits without incident, but still other visits were chaotic.

Meanwhile, throughout the litigation, the children were thriving in their resource placement. For example, the resource mother, M.B., had been taking Iris to occupational therapy and, also, Iris was on a waiting list for physical

 A-3697-18T2

therapy. Iris's children's specialist saw her for one hour per week and was going to increase the therapy to include additional services. Anna was receiving early intervention services, including developmental intervention, twice per week. For his part, Ricky was growing and sleeping through the night. Moreover, when the children were sick, M.B. obtained appropriate medical treatment.

In January 2019, Ronald S. Gruen, Ed.D., performed a bonding evaluation among the three children and M.B. and later between them and their parents. He also performed defendants' psychological evaluations.

Dr. Gruen determined that M.B. loved the children, the girls called her "mommy," and she provided structure for them. Although Ricky was young, he focused on M.B. and was comfortable with her. The children were "thriving in her care" and he recommended that M.B. become their adoptive mother.

During Dr. Gruen's bonding evaluation of Kim and Rick with the three children, the doctor observed that Kim and Rick attended the evaluation with toys and activities, and the children responded warmly to them even though the visit was "hectic." Dr. Gruen stated that Kim "was focused on putting [the toys and activities] together," which caused the children to run around without

Kim's "direct supervision or attention." Both Iris and Anna were defying Kim's and Rick's direction and instructions, and the parents had difficulty focusing on one thing at a time. While Dr. Gruen found Rick to be "settled," he found Kim to be "anxious," and "tense." Dr. Gruen concluded that although Kim and Rick loved their children, they were not qualified parents and the termination of their rights would not cause significant emotional harm.

As to Kim's psychological evaluation, Dr. Gruen commented that Kim was unfocused during the meeting. She avoided discussing difficult topics and did not want to address her parenting inadequacies. Additionally, her explanations for her parenting difficulties did not make sense and she denied abusing drugs. Kim also could not understand her children's special needs, and, instead, she stated that any special needs the children had were because they "miss[ed] their parents, and [M.B.] allow[ed] the children to get out of control." Overall, Kim could not parent the children in a satisfactory manner.

During Rick's psychological evaluation, he stated that the Division took his children without reason and that neither he nor Kim had done anything wrong. Moreover, he defended Kim and explained that he would remain in a relationship with her. Rick discussed his stable job, the extensive travel needed to get to his job, and that his job meant a lot to him. Rick admitted that

19

he had a history of incarceration and criminal behavior. Dr. Gruen concluded that in addition to the fact that Rick would not be the primary parent, he also lacked good judgment in believing that Kim could be a proper parent to the children.

Judge Axelrad presided over the guardianship trial for three non-consecutive days in March 2019. At the trial, the Division presented the testimony of Jacqueline Cassidy, a Division caseworker, and Dr. Gruen. The Division also called Kim as a witness to testify for the limited purpose of discussing her medical releases that she signed. She did not testify on her own behalf, and neither she nor Rick submitted documentary evidence. Rick testified on his own behalf.

Cassidy testified to the above and further about the Division's history with Kim and Rick. She testified that Kim had always minimized, if not completely denied her drug use, since she became known to the Division. She described Kim's refusal to sign medical releases and to attend treatment programs. When Kim signed a release, she placed significant restrictions on them, rendering them useless for the Division's purposes.

Cassidy also described the problems that occurred during visitation, the concern the Division had over the children's safety, the difficulty the

Division's staff had communicating with Kim and Rick, and all of the services that the Division referred both parents to without success. She made note of the children's special needs and the services they received, which included: Physical therapy; occupational therapy; individual in-home therapy; and services at school, such as speech therapy. Finally, Cassidy described the children's success in their resource home with M.B., who wanted to adopt them. Cassidy explained that M.B.'s father lived with her, helped care for the children, and was also a licensed resource parent. Meanwhile, while Kim and Rick lived together, Rick worked a ten-hour shift four days per week and had a two-hour commute to work each way. While at work, Rick wanted to leave the children with Kim, who he thought would be a proper caretaker.

The Division called Kim as a witness and asked her to discuss the matter of her medical releases. Kim admitted to signing the releases, but also to writing in restrictions to prevent the Division from obtaining information.

Dr. Gruen testified to what he included in his report. He stated that neither parent was capable of providing a minimal level of safe parenting. He found that in addition to being unfocused during the evaluation, Kim avoided uncomfortable topics and recreated her history to downplay her mental health and substance abuse issues. During testing, Kim refused to complete certain

21

evaluations, which caused Dr. Gruen to conclude that she would be unable to provide the structure that the three young, special needs children required. Moreover, she lacked patience and structure, and she did not possess adequate decision-making abilities. Her untreated substance abuse problems prevented her from parenting safely and effectively. Dr. Gruen stated that Kim would be unable to focus on the children's needs, would be unable to watch them properly, and was in denial about her parenting shortcomings, despite her claims that she was a structured and disciplined parent. Rick would not be able to assist Kim with childcare responsibilities because he worked long hours and only came home to sleep. Overall, Dr. Gruen concluded that Kim could not parent at the time of the evaluation or for the foreseeable future due to her history of substance abuse and lack of direction.

As to Rick, Dr. Gruen similarly concluded that he would be unable to parent the children safely for the foreseeable future. Rick showed poor judgment by deciding that Kim would be the primary caretaker of the children. He had a history of incarceration but denied current involvement in criminal behavior. Rick failed to recognize why the children were removed and blamed the Division for his problems. He rejected ideas and suggestions that were not consistent with his viewpoint, believing that he knew best. Dr. Gruen testified

22

about Rick's inability to understand that Kim could not cope with stress and that there was a risk she would abuse drugs as she had done in the past.

Dr. Gruen was concerned that Rick's history of anger issues would continue and be witnessed by the children to their detriment. Moreover, Rick refused to accept that his children had special needs, which would hinder the children's ability to receive proper care. In that vein, Rick had his own history of neglect because he failed to properly care for Iris's dental needs. Overall, Rick demonstrated a lack of insight and judgment.

During the bonding evaluation of defendants with the children, Dr. Gruen testified that neither Iris nor Anna followed Kim's directions. Being able to follow instructions was important for special needs children to keep them safe and to educate them properly. While Rick tried to calm Kim down, it was ineffective. Dr. Gruen believed there was a superficial bond between the parents and the children did not recognize them as parental figures. The children's attachment with Kim and Rick was insecure and could lead to behavioral problems if reunification were to occur. He concluded the children would not suffer severe and enduring harm if parental rights were terminated.

In contrast, Dr. Gruen testified that during the bonding evaluation among the three children and M.B., the children followed her directions, were

23

attentive, and remained focused. Moreover, the children benefited from the structure and security M.B. provided. Dr. Gruen believed that M.B. loved the children, and she was very nurturing. The children were well behaved in her care. Dr. Gruen concluded that the three children were securely attached to M.B. and that removal would cause them severe and enduring harm. Kim and Rick would not be able to mitigate the harm.

Rick testified on his own behalf and claimed that he and Kim did everything that the Division asked and more. Nevertheless, he admitted that he did not complete services because it interfered with his work schedule and personal time. He asserted that the Division falsified the claims against them. Rick believed that the Division took his children away from him without a reason, and he denied that the children had any problems. He thought that the children would be fine once the Division was no longer involved in their lives. Rick denied that he or Kim behaved poorly towards service providers or at visitation and denied threatening workers and threatening to kill a judge. While Rick complained that the Division had not assisted him with housing, he admitted that he neither presented the Division with a potential apartment nor requested financial assistance.

A-3697-18T2

On April 12, 2019, Judge Axelrad terminated Kim's and Rick's parental rights to the three children. The judge placed her reasoning on the record in a comprehensive, detailed oral decision. This appeal followed.

The scope of our review is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). We "must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." Ibid. We "defer to the trial court's credibility determinations" and to its "special expertise in the field of domestic relations." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552-53 (2014) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). We will not alter the trial court's findings unless there was a manifest denial of justice. N.J. Div. of Youth & Family Servs. v. V.K., 236 N.J. Super. 243, 255 (App. Div. 1989). However, the trial court's interpretation of the law and legal findings are reviewed pursuant to a de novo standard. R.G., 217 N.J. at 552.

At the outset, we acknowledge that an order terminating parental rights represents a significant interference with substantial rights. Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346-47 (1999). "The rights to conceive and to raise

25                                                          A-3697-18T2

one's children have been deemed 'essential,' 'basic civil rights . . . ,' and 'rights far more precious . . . than property rights.'" Stanley v. Illinois, 405 U.S. 645, 651 (1972) (second alteration in original) (citations omitted). "[T]he preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare . . . ." N.J.S.A. 30:4C-1(a); see also K.H.O., 161 N.J. at 347.

The constitutional right to the parental relationship, however, is not absolute. R.G., 217 N.J. at 553; N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986), superseded by statute on other grounds, N.J.S.A. 9:3-46(a). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining when a parent's rights must be terminated in the child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to

provide a safe and stable home for the child and the delay of permanent placement will add to the harm . . . ;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11.

The Division must prove each prong by the heightened standard. If one prong is not proven, then the Division has failed to meet its burden. See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 280 (2007).

Here, by way of a thorough oral decision, Judge Axelrad found the Division demonstrated, through the submission of clear and convincing evidence, that all four prongs supported termination of defendants' parental rights. Since the judge's findings were supported by evidence she found credible, we are obligated to defer to her findings. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012); Cesare, 154 N.J. at 413.

Judge Axelrad found that the Division proved the first two prongs. Contrary to defendants' contention on appeal, the judge's consideration of those two prongs together did not undermine the validity of her findings. See

27

F.M., 211 N.J. at 451 ("The second prong, in many ways, addresses considerations touched on in prong one."); In re Guardianship of DMH, 161 N.J. 365, 379 (1999) ("[E]vidence that supports [prong] one informs and may support the other [prong] as part of the comprehensive basis for determining the best interests of the child.").

As to the first prong, the judge relied upon Kim's history of unmitigated substance abuse, her mental health issues, and her inability to recognize her children's special needs, all of which prevented her from safely parenting her children. The judge also relied on Rick's failure to acknowledge Kim's issues and to continually assert that she was a proper caregiver for the children, whose special needs Rick refused to accept and attributed only to the Division making up lies. The judge also relied upon both parents' uncontrolled rage directed at third parties and each other. In addition, the judge found support for her findings in Dr. Gruen's unrefuted opinions. For all of those reasons, the judge found that neither parent could safely care for the children.

Under prong two, the judge found that neither parent demonstrated a willingness to address their problems because they refused to recognize problems existed. Although they were offered numerous services, Kim and

Rick refused to comply or they did so by lashing out and verbally assaulting the Division's representatives and its providers' employees.

As to the third prong, before concluding the Division met its burden, the judge delineated all of the services offered to defendants by the Division, and she reviewed the individuals who the Division considered for placement in lieu of perusing the termination of defendants' parental rights. Moreover, the judge explained why the children's need for permanency trumped defendants' suggestion that they should be allowed to pursue an alternative plan to termination of their parental rights under the FN docket.

As to the fourth prong, after weighing all of the evidence and again considering Dr. Gruen's opinion, the judge concluded that the children would not "suffer a greater harm . . . [by] the termination of ties from their natural [parents] than from the permanent disruption of the relationship with the resource parent."

We conclude that all of the judge's findings were well supported by the credible evidence in the record. We find defendants' arguments to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). This includes Rick's contentions about the judge's alleged prejudice and his

A-3697-18T2

attorney's failure to object, which arose from Judge Axelrad's passing comment about Rick's threat to harm another judge.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3697-18T2