# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0210-24

IN THE MATTER OF L.M.P.

_____

Argued November 12, 2025 – Decided January 6, 2026

Before Judges Susswein, Chase and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Petition No. 0901-XTR-2024-000001.

Gregg D. Trautmann (Trautmann & Associates, LLC) argued the cause for appellant.

Khyzar Hussain, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Wayne Mello, Acting Hudson County Prosecutor, attorney; Khyzar Hussain, of counsel and on the brief).

PER CURIAM

Petitioner L.M.P.[1] appeals a September 17, 2024 Final Extreme Risk Protective Order (FERPO) entered against her pursuant to the Extreme Risk Protective Order Act of 2018, N.J.S.A. 2C:58-20 to -32 (the Act), also known as New Jersey's Red Flag Law. Entry of the FERPO prohibits petitioner from owning or possessing a firearm or ammunition and revokes her New Jersey Firearms Identification Card. L.M.P. contends on appeal that the trial court erred in entering a FERPO against her considering the available evidence and the court's apparently contradictory finding that she did not pose a danger to herself or others. Petitioner also raises a facial constitutional challenge to the Act, arguing that the preponderance of the evidence standard adopted by the statute infringes on an individual's Second Amendment rights.

After reviewing the record in light of the governing legal principles, we conclude that the trial court erred in finding, by a preponderance of the evidence, that petitioner posed a significant danger of bodily injury to herself or others by having custody or control of, owning, possessing, purchasing, or receiving a firearm. We therefore reverse the lower court's decision and vacate the entry of

_____

[1] We use initials to maintain the confidentiality of these proceedings. R. 1:38-5(a).

the FERPO against L.M.P.  We decline to reach petitioner's constitutional arguments.

I.

We discern the following pertinent facts and procedural history from the record.  Petitioner L.M.P. and her husband E.S. are a married couple residing in Bayonne.  On July 9, 2024, Bayonne police officers arrived at the couple's home to inform them of the untimely death of their only son.  L.M.P. and E.S. became distraught upon hearing this tragic news.  E.S. made several pertinent statements to police during the interaction.  According to reporting Officer Krzeminski, E.S. told the officers that there was a "gun upstairs," stated that his wife would shoot herself, asked Officer Krzeminski to take out his firearm and shoot him, and asked the officer to remove the gun from the residence because he was going to "eat the gun."  E.S. was taken to Bayonne Medical Center for a psychological evaluation.  L.M.P. remained quiet throughout the encounter with police and later testified that she "went into severe shock."

During the police visit to the home, L.M.P. voluntarily surrendered the firearm, which was brought to Bayonne Police Headquarters.  A Petition for Temporary Extreme Risk Protective Order (TERPO) was filed on behalf of the Bayonne Police Department against L.M.P.  The petition alleged that L.M.P.

A-0210-24

posed an immediate and present danger of causing bodily injury to herself or others and asked the court to grant a TERPO to prohibit her from owning, possessing, or acquiring firearms. The trial court granted the TERPO on the same day.

A FERPO hearing was held on September 17, 2024. The State called Officer Krzeminski as a witness and played footage captured by Sergeant Bunin's and Officer Bran's body-worn cameras. The State also admitted Officer Krzeminski's incident report. L.M.P. and E.S. represented themselves and presented no evidence or witnesses other than their own testimony.

Officer Krzeminski testified that he and Sergeant Bunin responded to L.M.P. and E.S.'s home to make a notification to the couple about the passing of their son. Krzeminski testified that the couple "became emotional from the tragic news," and E.S. stated that there was a firearm upstairs "and [that] he was concerned about his wife and his own safety due to the tragic news that they received." Krzeminski testified that E.S. "stated that he may want to harm himself with that firearm," and that he was "going to blow [his] brain[s] out." Krzeminski also testified that he did not interact much with L.M.P. and that she was "very quiet."

A-0210-24

L.M.P. and E.S. asked not to be present in the courtroom while the State played the body-worn camera footage from July 9, 2024, not wanting to "relive" those moments. As the State played excerpts from the body camera footage, Krzeminski testified as to what was happening in the video. E.S. can be heard on the body camera footage telling the officers "you're going to have to take [the gun] because I want to put it in my mouth." Krzeminski testified that E.S. "just kept saying he wanted to die. He wanted to kill himself."

E.S. cross-examined Officer Krzeminski, asking if the gun was "put away without being loaded," to which Krzeminski responded "it was." E.S. then asked if the gun was "in a safe place" to which Krzeminski responded "Yes."

The Court had the following colloquy with Officer Krzeminski following the cross-examination:

> THE COURT: Do you recall what, if anything was said, what comments were first said about the gun? How did you first learn of the gun?
>
> THE WITNESS: So, me and [E.S.] were outside in his backyard, and I was with [E.S.]. My sergeant [was] upstairs with [L.M.P.] . . . [a]nd [E.S.] said, hey, you guys better get up there. There's a gun up there. My wife is going to use it. At that point I notified my sergeant over the radio, hey, there's a gun up there. Just use caution. And that's when we called for another unit. And [E.S.] just kept repeating, you know, take the gun away from me, because if you don't, I'm going to harm

A-0210-24

myself. At one point he asked me to take out my firearm and shoot him.

L.M.P. also testified at the hearing. The following is the totality of her testimony:

> So, the only thing I would like to say is that it was a very unfortunate day for my husband and I. And I went into severe shock from the second they gave us the news. I didn't say anything. I didn't threaten anybody. I have no mental health issues. I could tell you that I have worked at my place of employment for over ten years. I've been in the same line of business for over [twenty-five] years. I've been an upstanding citizen. So, the gun that was pulled from me is owned by me and registered by me. So, that's all I have to say.

E.S. also testified as follows:

> I would just like to say that I was in, I thought I was dreaming to be honest with yas (sic). And it just turned out that I wasn't. And we've been broken into over four times. We've had someone climb into our back window through an air conditioner. We've had someone enter our home and actually steal from us. The last person that broke into our home was when the cops arrived he had knives, rope, duct tape, all in a book bag. And that's why, that's one of the reasons why my wife got fingerprinted to get a gun. And we collect rent from [twenty-seven] different tenants, which is usually around like $60,000 a month that we keep, and there is old tenants that we rented to with bad criminal histories that have threatened us. So, we felt like we needed it for our protection. Thank you.

6

The trial court noted that in this case, a TERPO was issued for both L.M.P. and E.S., and with respect to L.M.P., it was E.S. who asked officers to remove the firearm "because he was concerned that [L.M.P.] would shoot herself . . . ." Accordingly, the court found the basis of the TERPO was a report by "a family member alerting the police that there was a gun in the home. And that . . . family member was concerned if left there, that harm would come to [L.M.P.] at her own hands with having the gun."

The trial court found all witnesses credible, explaining the body camera footage supported Officer Krzeminski's testimony regarding what transpired during the incident. The trial court further noted that Officer Krzeminski's report affirmed his testimony that E.S. told officers that there was an unsecured firearm in the bedroom closet and "he believed that [L.M.P.] may use the firearm to harm herself due to the child's passing."

The trial court explained what findings were necessary to grant or deny a FERPO:

> Again, with respect to what we need to make the findings here, when a petition is reviewed by a [c]ourt it must give me the factual grounds for the relief, and it must provide the available information with respect to the respondents' firearms and ammunition. The [c]ourt shall issue a [FERPO] if [i]t finds by a preponderance of the evidence at the hearing that the . . . respondent or respondents poses a significant danger of bodily injury

A-0210-24

to self or others by owning, possessing, purchasing or receiving a firearm. The [c]ourt must place on the record the reason for, the reasons supporting [i]ts decision to either grant or deny an order.

The court enumerated the eight initial factors it was required to consider pursuant to N.J.S.A. 2C:58-23 and weighed each individually based on the evidence presented, finding the first factor, whether there is a history of threats or acts of violence towards self or others, to be relevant to the court's inquiry. Specifically, E.S. made repeated statements about self-harm with a firearm, supported by testimony and body camera footage.

The trial court acknowledged that the concerns about L.M.P. were based on her husband's statements to police, not her own actions or words. The court noted:

> [W]ith respect to [L.M.P.] there is nothing in the record before me that she indeed had made any acts of violence towards herself or towards others. Again, it was her husband who had . . . requested that the police officers take the gun from the home because he was afraid that his wife would use it.

The court nonetheless concluded that E.S.'s statements were relevant because a respondent's family member may alert the court to the respondent's potential acts of violence towards self.

Concerning factors two through seven, the trial court found no evidence of use or threatened use of physical force against others, no restraining orders (temporary or final), no convictions or pending charges for violent or stalking/domestic violence offenses, no history involving cruelty to animals, and no evidence of drug or alcohol abuse.

With respect to factor eight, which requires the court to consider how recently the firearm was acquired, the court found that the gun permit was executed within six months prior to the incident, meeting the statutory definition of "recent" acquisition.[2] N.J.S.A. 2C:58-21. The court then considered three additional factors enumerated in an Administrative Office of the Courts directive (AOC Directive), finding no evidence of reckless display or use of the firearm, no prior extreme risk protective orders, and no violations of such orders. Administrative Directive #19-19: Guidelines for Extreme Risk Protective Orders (Aug. 12, 2019).

Finally, the court considered four additional mental health factors enumerated in the AOC Directive, finding no evidence of involuntary commitment, ongoing or past mental health treatment, failure to comply with

---

[2] N.J.S.A. 2C:58-21 defines a recent acquisition as "within six months prior to the date the petition was filed."

A-0210-24

treatment, or formal diagnosis. Ibid. The only mental health intervention occurred when E.S. was taken to Bayonne Medical Center for evaluation on the day of the incident.

The trial court found that factors one and eight weighed in favor of issuing the FERPO, but no other factors were applicable, concluding:

> It is not lost on the [c]ourt that these two are married. That it was although registered and purchased by [L.M.P.] it was [accessible] to both parties. It was in a closet unsecured with both the ammunition and the like next to it, accessed by both parties. And given both parties', the statement of [E.S.], as well as, the concerns that he as the family had as to what his wife would do with that gun if left to her own. The [c]ourt is satisfied there is a credible, a preponderance of the credible evidence to support . . . a final extreme risk protective order.

Based on the preponderance of the evidence standard, the court found that the evidence presented demonstrated that L.M.P. and E.S. posed a danger of self-harm warranting issuance of the FERPO, stating:

> The [c]ourt is satisfied again by a finding that the preponderance of the credible evidence supports a finding by this [c]ourt that both [L.M.P.], as well as, [E.S.] pose a significant danger of bodily injury to self by owning, possessing, purchasing or receiving a firearm.

The court thereupon entered FERPOs against L.M.P. and E.S. and revoked L.M.P.'s New Jersey Firearms Identification Card.

10

Petitioner raises the following issues for our consideration on appeal:

POINT I

THE TRIAL COURT ERRED IN ENTERING A FERPO WHEN IT HAD ALREADY MADE AN EXPRESS FINDING THAT THE GUN OWNER HAD NOT MADE ANY ACTS OF VIOLENCE TOWARDS HERSELF OR OTHERS

POINT II

THE ENTRY OF A FERPO WAS AGAINST THE WEIGHT OF THE ADEQUATE, SUBSTANTIAL, AND CREDIBLE EVIDENCE

POINT III

THE ENTRY OF A FERPO BASED UPON THE PREPONDERANCE OF EVIDENCE STANDARD AMOUNTS TO CONSTITUTIONAL VIOLATIONS OF THE LAWFUL GUNOWNER'S RIGHTS

II.

We begin by acknowledging the legal principles governing this appeal. Forfeiture of firearms involves a "fact-sensitive analysis." In re Forfeiture of Pers. Weapons & Firearms Identification Card belonging to F.M., 225 N.J. 487, 505 (2016) (quoting State v. Cordoma, 372 N.J. Super. 524, 535 (App. Div. 2004)). "The scope of appellate review of a trial court's fact-finding function is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). In reviewing the trial court's evidentiary findings, "an appellate court should not substitute its own

11

judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). However, "[a] 'trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Eichen, Levinson & Crutchlow, LLP v. Weiner, 397 N.J. Super. 588, 593 (App. Div. 2008) (quoting Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)). "We apply the same legal standard the trial judge did, and our review of [their] conclusions is de novo." Ibid.

"The Extreme Risk Protective Order Act of 2018 (the Act), New Jersey's 'red flag law,' empowers a court to remove firearms from a person who 'poses a significant danger of bodily injury to . . . self or others' by possessing them." Matter of D.L.B., 468 N.J. Super. 397, 400 (App. Div. 2021) (quoting N.J.S.A. 2C:58-24(b)). "New Jersey . . . adopted a 'red flag law' to permit family members and others to seek emergent orders to remove firearms from a person who poses a danger to self or others because of a mental health crisis or instability." Id. at 400-01 (citing Response of the Supreme Court Criminal Practice Committee to Proposed Rule 3:5B "Extreme Risk Protective Orders" 1 (May 28, 2019)). The Act "permits the emergent removal of weapons from any

person who poses a danger to self or others." Id. at 401. A family or household member or a law enforcement officer may petition the court for an order by "alleging that the respondent poses a significant danger of bodily injury to self or others by having custody or control of, owning, possessing, purchasing or receiving a firearm." N.J.S.A. 2C:58-23(a); see also N.J.S.A. 2C:58-21 (defining "petitioner" to mean "family or household member or law enforcement officer").

The law establishes a two-step process for issuing temporary and final orders to remove a person's firearms and ammunition, firearms purchaser identification card, handgun purchase permit, and handgun carry permit. N.J.S.A. 2C:58-23 (authorizing TERPO); N.J.S.A. 2C:58-24 (authorizing FERPO). First, the court decides if it will issue a temporary order to remove firearms based on an ex-parte documentary record. See N.J.S.A. 2C:58-23. Next, following a plenary hearing, the court decides if it will issue a final order to remove firearms indefinitely. See N.J.S.A. 2C:58-24.

There are eight initial factors a court must consider before deciding to issue a TERPO or FERPO—whether the respondent:

> (1) has any history of threats or acts of violence by the respondent directed toward self or others;

(2) has any history of use, attempted use, or threatened use of physical force by the respondent against another person;

(3) is the subject of a temporary or final restraining order or has violated a temporary or final restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991," . . . ;

(4) is the subject of a temporary or final protective order or has violated a temporary or final protective order issued pursuant to the "Sexual Assault Survivor Protection Act of 2015," . . . ;

(5) has any prior arrests, pending charges, or convictions for a violent indictable crime or disorderly persons offense, stalking offense pursuant to section 1 of (C.2C:12-10), or domestic violence offense enumerated in section 3 of (C.2C:25-19);

(6) has any prior arrests, pending charges, or convictions for any offense involving cruelty to animals or any history of acts involving cruelty to animals;

(7) has any history of drug or alcohol abuse and recovery from this abuse; or

(8) has recently acquired a firearm, ammunition, or other deadly weapon.

[D.L.B., 468 N.J. Super. at 403 (quoting N.J.S.A. 2C:58-23(f)).]

In addition to the above factors, courts should consider "any other relevant evidence." N.J.S.A 2C:58-24(c).

14

Attorney General, <u>Law Enforcement Directive No. 2019-2</u> (Aug. 15, 2019) (AG Directive) and the AOC Directive discuss the Act and provide guidance to law enforcement, litigants, and trial courts. <u>D.L.B.</u>, 468 N.J. Super. at 402. "[A] trial court is required to comply with the requirements of the directive and the AOC guidelines" because they have the "force of law." <u>Ibid.</u> (internal quotation marks and citations omitted). The AOC Directive "promulgates Guidelines . . . that prescribe the process for obtaining orders under the Act." <u>Ibid.</u> Guideline 3(d) includes the following additional factors— whether the respondent:

> (9) has recklessly used, displayed, or brandished a firearm;
>
> (10) has an existing or previous extreme risk protective order issued against him or her; and
>
> (11) has previously violated an extreme risk protective order issued against him or her.
>
> [Guideline 3(d).]

Guideline 3(d) also permits the court to consider four additional mental health factors, but only after the court finds one or more of the behavioral factors set forth in subsections (1) through (11). Those additional factors include whether the respondent:

A-0210-24

(12) has any prior involuntary commitment in a hospital or treatment facility for persons with psychiatric disabilities;

(13) has received or is receiving mental health treatment;

(14) has complied or has failed to comply with any mental health treatment; and

(15) has received a diagnosis of a mental health disorder.

[Guideline 3(d).]

A FERPO shall be ordered by the court upon a finding "by a preponderance of the evidence at the hearing that the respondent poses a significant danger of bodily injury to the respondent's self or others by having custody or control of, owning, possessing, purchasing, or receiving a firearm." N.J.S.A. 2C:58-24(b). "The court shall place on the record the reasons supporting its decision to grant or deny the order." Guideline 6(a). "Under the preponderance standard, a litigant must establish that a desired inference is more probable than not. If the evidence is in equipoise, the burden has not been met." New Jersey Div. of Youth And Fam. Servs. v. N.S., 412 N.J. Super. 593, 615 (App. Div. 2010) (quoting Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006)) (internal quotation marks omitted).

A-0210-24

## III.

Applying the foregoing legal principles to the matter before us, we conclude that the trial court erred in entering a FERPO against L.M.P. because the State failed to meet its burden of demonstrating, by a preponderance of the evidence, that L.M.P. posed a significant danger of bodily injury to herself or others by possessing a firearm.

While the trial court properly considered the relevant factors pursuant to N.J.S.A 2C:58-23(f), it erred in concluding that the first factor, whether there is a history of threats or acts of violence towards self or others, supported the entry of a FERPO against L.M.P. In reaching its conclusion, the court relied exclusively on statements made by L.M.P.'s husband E.S. that she would harm herself. The trial judge acknowledged that the concerns about L.M.P. were based on her husband's statements to police, not her own actions or words, explaining, "with respect to [L.M.P.] there is nothing in the record before me that she indeed had made any acts of violence towards herself or towards others. Again, it was her husband who had . . . requested that the police officers take the gun from the home because he was afraid that his wife would use it." Likewise, Officer Krzeminski testified that he did not have much interaction with L.M.P. and that she was "very quiet." Based on the available evidence, and

17

the trial court's own factual findings that L.M.P. had not committed any acts of violence towards herself or others, it was error for the court to conclude that L.M.P. posed a risk to herself or others warranting issuance of a FERPO against her based solely on the statements of L.M.P.'s distraught husband.

We note that the only other factor the trial judge found relevant was factor eight concerning the length of time since defendant had acquired the firearm. We are not convinced that this factor should weigh in favor of entering a FERPO against petitioner when there is no evidence that the firearm was purchased in contemplation of the tragic event that led to the issuance of the TERPO. We emphasize this is not a situation where the purchased gun was used in a crime. It is undisputed, moreover, that the tragic loss of L.M.P.'s son was unexpected. Furthermore, as E.S. explained in his testimony at the FERPO hearing, the firearm was purchased for a legitimate purpose—to protect the home following more than one burglary. The point simply is that in these distinctive circumstances, the purchase date of the gun has no rational bearing on the likelihood it would be used for self-harm or to harm others.

We add that at the FERPO hearing, the State did not introduce any evidence or information gathered after the initial meeting where officers informed L.M.P. and E.S. of the tragic loss of their son. Nothing in the record

18

before us supports the initial statement E.S. made to police that he feared his wife would harm herself in reaction to the tragic news they were just given.

Furthermore, none of the other fifteen factors enumerated by the trial court were found to apply. We emphasize the court's observation that "with respect to [L.M.P.] there is nothing in the record . . . that she indeed had made any acts of violence towards herself or towards others." Such a finding cannot support a contradictory conclusion that L.M.P. posed a significant danger to herself or others. Although we are reticent to substitute our judgment for that of the trial court, see Brown, 170 N.J. at 147, we conclude that in these circumstances, the State did not present sufficient credible evidence to find it "more probable than not" that L.M.P. posed a significant danger to herself or others warranting entry of the FERPO against her. N.S., 412 N.J. Super. at 615; N.J.S.A. 2C:58-24(b).

Accordingly, we reverse the trial court's decision and vacate the entry of the FERPO against L.M.P. Having concluded that the State did not meet its burden of proof by a preponderance of the evidence, we decline to reach L.M.P.'s constitutional challenge to New Jersey's Red Flag Law.[3] See Comm. to Recall

---

[3] We note that Rule 4:28-4 requires notice to the New Jersey Attorney General of a constitutional challenge to any state statute. So far as we can determine, L.M.P. did not comply with this rule, depriving the Attorney General the opportunity to participate before the trial court and this court on the constitutional question.

A-0210-24

Menendez v. Wells, 204 N.J. 79, 95 (2010) (As a general principle, courts "strive to avoid reaching constitutional questions unless required to do so"); Randolph Town Ctr., L.P. v. Cnty. of Morris, 186 N.J. 78, 80, 891 (2006) ("Courts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation.").

Reversed for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0210-24